John H. STORY, Appellant (Defendant),

v.

The STATE of Wyoming, Appellee (Plaintiff).

No. 85–158.

Supreme Court of Wyoming.

June 17, 1986.

Rehearing Denied July 29, 1986.

Gerald R. Mason (argued) and Van Graham, Mason & Twichell, Pinedale, for appellant (defendant).

A.G. McClintock, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Sylvia Lee Hackl (argued), Sr. Asst. Atty. Gen., and Thomas A. Maurer, Asst. Atty. Gen., for appellee (plaintiff).

Before THOMAS, C.J., and BROWN, CARDINE, URBIGKIT and MACY, JJ.

CARDINE, Justice.

Appellant, a physician, was convicted of six separate charges involving sexual assault of patients and sentenced to 12 to 15 years on each of three charges, 15 to 20 years on each of two charges, and 10 to 15 years on the final charge, the sentences to run concurrently. The questions presented for our determination in this appeal are whether there was sufficient evidence to sustain the conviction of first degree rape of TT; whether delay in charging the crimes deprived appellant of due process of law; whether error occurred in the admission of an out-of-court experiment, a tissue allegedly containing semen, and testimony of a rebuttal witness; whether there was error in evidentiary rulings, error in limiting cross-examination, surrebuttal, and evidence concerning appellant's theory of defense; and whether there was prosecutorial misconduct and error in instructions to the jury.

We reverse one of the convictions and affirm the other five.

## FACTS

Appellant, John H. Story, is a physician who was engaged in the general practice of medicine in Lovell, Wyoming. In his practice he did pelvic examinations of women in the examining room of his office. The pelvic examinations by appellant consisted of a visual examination of the vaginal tract with an instrument called a speculum and a manual check of the ovaries and uterus. Appellant performed the manual portion of the examination by inserting one to three fingers into the vagina while pressing on the abdomen with the other hand. During the examination the patient was undressed, lying on an examining table with her feet in stirrups, knees bent, and covered with a sheet. In this position the patient could

see only the head and shoulders of Dr. Story as the examination was performed. It was during pelvic examinations that the crimes of which appellant was convicted occurred.

Appellant was charged with forcible rape of HF, TT, WH, AT, CP, and EMc, in violation of § 6–63, W.S.1957, which provided in pertinent part:

"*Rape; degrees of rape defined.*—(A) Whoever unlawfully has carnal knowledge of a woman or female child forcibly and against her will is guilty of first-degree rape, and shall be imprisoned in the penitentiary for any term not less than one (1) year, or during life.

"(B) Whoever unlawfully has carnal knowledge of a female child under the age of fifteen (15) years with her consent shall be guilty of second-degree rape and shall be imprisoned in the penitentiary for not less than one (1) year and not more than fifty years."

He was charged with forcible rape of EM, GJ, and AD, contrary to § 6–4–303(a)(vii), W.S.1977, which provided:

"(a) Any actor who inflicts sexual penetration or sexual intrusion on a victim commits sexual assault in the second degree if, under circumstances not constituted sexual assault in the first degree:

\*      \*      \*      \*      \*      \*

"(vii) The actor inflicts sexual penetration or sexual intrusion in treatment or examination of a victim for purposes substantially inconsistent with reasonable medical practices or in a manner substantially inconsistent with reasonable medical practices."

Appellant was found guilty of forcible rape of TT and CP contrary to § 6–63, W.S.1957, supra; guilty of a lesser-included offense, assault and battery with intent to commit rape, of HF, WH, and AT, contrary to the provisions of § 6–64, W.S.1957, which provided:

"*Attempt to commit rape.*—Whoever perpetrates an assault or assault and battery upon any female with intent to commit the crime of rape, shall, upon conviction, be imprisoned in the penitentiary not less than one year nor more than fifty years";

and guilty of second degree sexual assault of EM contrary to § 6–4–303(a)(vii), W.S. 1977, supra. Appellant was found not guilty with respect to the charges of sexual assault of EMc, GJ, and AD.

The evidence in support of the convictions of sexual assault upon CP, HF, WH, AT, and EM demonstrated, with some minor variations, a pattern of action. Three of the victims testified that Dr. Story informed them that he would be using a new instrument, a round tube, to dilate them and facilitate the exam. He then inserted his penis into the vagina of all but one of the victims. All but one of the victims observed Dr. Story's erect penis out of his unzipped trousers. Some of the victims said Dr. Story exposed himself to them by moving to the side of the examining table. All but one of the victims said Dr. Story penetrated them. When asked about their feelings and why some had not resisted and had not reported what had happened, they said they trusted Dr. Story, that they were shocked, afraid, and did not want to talk about it.

Thus, WH testified:

"Q. Did you consider reporting it \* \*?

"A. I thought about it.

"Q. Why didn't you?

"A. I was afraid. I knew that—

"Q. Why were you afraid?

"A. Who would believe me? It was just I and Dr. Story and my word against his."

AT stated:

"Q. What was your state of mind at that time?

"A. I was in shock and afraid.

"Q. Why were you afraid?

"A. Because nothing like that had ever happened before.

\*      \*      \*      \*      \*      \*

"A. I was confused and hurt and angry and embarrassed."

CP, who lifted the sheet and observed Dr. Story, stated:

"A. I couldn't believe it. I was shocked. I couldn't believe it.

\*     \*     \*     \*     \*     \*

"Q. Did you talk to anyone on the way out [of the office]?

"A. No, I just went out and got in my car. I just kept thinking, what am I going to do. Where do I go."

When CP was asked why she told no one other than her mother, she stated, "I was afraid * * * no one would believe me."

EM testified:

"Q. Did you tell your husband about this?

"A. I did not.

"Q. Why not?

"A. I couldn't do that to him.

"Q. What was your husband's health like at this time?

"A. Well he was not very well. Hadn't been well for a long time. And eventually, within two years, he was gone."

## SUFFICIENCY OF EVIDENCE—RAPE OF TT

Appellant contends in his brief that there was insufficient evidence to support his conviction of the rape of TT because she did not

"see the insertion of the penis, * * * know that a penis had been inserted, * * did not see the alleged assault, [but] she is relying entirely upon a seven-year-old memory of a sensation which she then compares to a sensation experienced in marriage to arrive at a conclusion * *."

■ A rape conviction may be upheld upon the testimony of the victim alone. *Brown v. State*, Wyo., 581 P.2d 189, 191 (1978). In considering upon appeal the question of the sufficiency of evidence to support a jury verdict of guilty, we review the evidence, both direct and circumstantial, in a light most favorable to the State ascribing to that evidence all reasonable inferences that may fairly be drawn there-

from. *Smith v. State*, Wyo., 564 P.2d 1194, 1198 (1977). An inference is a process of reasoning by which a fact or proposition is deduced fairly and logically from other facts proven or admitted. An inference is truly evidence. The weight to which it is entitled depends upon the facts and circumstances of each particular case, and that is ordinarily for the jury. *Kobielusz v. Wilson*, Wyo., 701 P.2d 559 (1985). When considering sufficiency of evidence, we will not interfere with the jury's findings of fact and its resultant verdict if they are supported by any substantial evidence. *Smith v. State*, supra.

TT was a 15-year-old high school sophomore who, on April 17, 1968, visited Dr. Story because of abdominal pains with the onset of her menstrual cycle. She arrived after school, around 3:00 p.m., waited about an hour, then was taken to the examining room. She removed all her clothes and was sitting on the examining table when Dr. Story entered the room. At his instructions she lay down on the table, had her feet in the stirrups, and was draped tight across her knees for the examination. He began the examination by palpating her abdomen and inserting an instrument into her vagina so that he could see inside. She was then aware that he was examining her with a hand covered with a plastic glove which was followed by something she described as "different." With Dr. Story standing at the end of the table, she felt an object that she described as "very, very warm and soft and it was bare flesh * * * pushing inside of me." TT said it was very painful, and she began crying. Dr. Story then removed the object a little bit and pushed it in farther, and it hurt and she was crying and sobbing. He then pulled it back out and pushed it in again a little farther and suddenly she felt warm fluid go down her bottom. Dr. Story then grabbed the paper underneath her, ripped it, wadded it, and threw it into the garbage. He then wiped her off. As Dr. Story left the room, TT noted that he looked different than when he had entered because his shirt was straight and his pants were higher. As he left he said, "You did real good."

TT, being 15 years of age, had never had a sexual experience nor had she seen a naked man. She did not know what a penis was and did not then know she had been sexually assaulted. She was aware, however, that the pelvic examination he had just performed was different than one Dr. Story had performed before. Approximately seven years later, TT was married and became aware that she had been assaulted by Dr. Story. In testifying she was asked:

"Q. Now then do you know what the object was that Dr. Story inserted in you that day?

"A. It was his penis."

Dr. Story testified that a patient could tell the difference between two fingers and a penis and between a speculum and a penis. He agreed that the patient being examined was in a vulnerable position and that it was possible to sexually assault a patient in that position. However, he said the patient's cooperation would be needed and that cooperation was needed to insert the speculum.

TT's testimony seems to us more than sufficient for the jury to find that Dr. Story had committed a sexual assault upon her. TT positively testified that what Dr. Story had inserted into her was his penis. Dr. Story denied that. It was the function of the jury of twelve persons to resolve that dispute, and they resolved it against Dr. Story. There was no error in the jury's findings in this regard.

## DELAY IN FILING CHARGES

Appellant contends that the delay in charging the nine separate crimes of sexual assault was so excessive as to be violative of his due process rights under Art. 1, § 6 of the constitution of the state of Wyoming which provides:

"No person shall be deprived of life, liberty or property without due process of law,"

and violative of the Fifth and Fourteenth Amendments to the constitution of the United States. It is undisputed that the investigation of these charges began in June of 1984 and that the criminal complaint was filed on October 31, 1984. The information in the district court was filed November 19, 1984, charging appellant with ten counts of sexual assault in the second degree and seven counts of rape. The April 8, 1985 amended information, upon which appellant was tried, reduced the charges to six counts of rape in violation of § 6–63, W.S.1957, supra, and three counts of second degree sexual assault in violation of § 6–4–303(a)(vii), W.S.1977, supra. The incidents which were the bases of the nine charges occurred over a period of approximately seventeen years from July 24, 1967 to 1983. The period of time between the occurrence of the incidents and the charges against appellant ranged from 20 months to 17 years. It is this delay in charging that appellant claims denied him a fair trial and should result in dismissal of this case.

At common law there was no limitation period for the prosecution of any criminal offense. Where no statute of limitations pertaining to criminal offenses has been adopted, prosecution for such an offense may be commenced at any time during the life of the offender. *Vasquez v. State*, Tex.Cr.App., 557 S.W.2d 779 (1977); *State v. Brown*, 21 Md.App. 91, 318 A.2d 257 (1974). When statutes of limitations governing the commencement of prosecution for specific crimes are adopted, they are said to be acts of grace under which the sovereign surrenders its right to prosecute. Being acts of grace, statutes of limitations may be changed or repealed without violating ex post facto prohibitions, *People v. Isaacs*, 37 Ill.2d 205, 226 N.E.2d 38, 52 (1967); but in the final analysis, whether statutes of limitations governing prosecution of criminal offenses should be adopted at all is a matter solely for the legislature. *Bennett v. District Court of Tulsa County*, 81 Okl.Cr. 351, 162 P.2d 561, 573 (1945).

Forty-eight of the 50 states have adopted statutes of limitations with respect to certain crimes. Generally, these limitation periods have been adopted for less serious

crimes. None of these 48 states have limitation periods for murder or capital offenses. Many have no limitation period for the prosecution of some or all of the serious crimes. Of the states that have adopted statutes of limitations for criminal prosecutions, ten have no limitation period for the crime of rape. Comment, Criminal Law: Limitation of Prosecution—Time, 5 Land & Water L.Rev. 179 (1970). Wyoming is one of the two states which has no statute of limitations for any criminal case. The nine charges of rape filed against Dr. Story in this case were timely and properly brought by the State. See, 21 Am.Jur.2d Criminal Law § 223.

Although the prosecution of Dr. Story upon the nine sexual assault charges was not barred by any period of limitation, we must still determine whether his constitutional right to due process and a fair trial was denied by the delay in charging him. The cases dealing with this subject generally involve prosecutorial delay in charging. They are cases in which the prosecution had possession of facts and evidence of crimes but delayed commencing prosecution for periods of from a few months to as long as 19 years. *Stoner v. Graddick*, 751 F.2d 1535 (11th Cir.1985); *United States v. Comosona*, 614 F.2d 695 (10th Cir.1980). In *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), there was a delay of three years, two months between the commission of the crime and the return of an indictment. There was a five-year limitation period for commencing the prosecution. Thus, the prosecution had been timely commenced as far as the statute of limitations was concerned. The Court noted, however,

> "that the statute of limitations does not fully define the appellees' rights with respect to the events occurring prior to indictment,"

and that

> "the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused *substantial prejudice to appel-*lees' *rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused.*" (Emphasis added.) 92 S.Ct. at 465.

The Court also noted that a criminal prosecution, commenced within the limitation period provided, would not be dismissed for preaccusation delay where there was reliance only upon *potential prejudice and the passage of time* as being violative of due process. Where timely commenced, the defendant must establish that the precharging delay caused substantial prejudice to rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused. *United States v. Marion*, supra. The Court in *Marion*, supra, reversed the order dismissing the charges stating:

> "No actual prejudice to the conduct of the defense is alleged or proved, and there is no showing that the Government intentionally delayed to gain some tactical advantage over appellees or to harass them. Appellees rely solely on the real possibility of prejudice inherent in any extended delay: that memories will dim, witnesses become inaccessible, and evidence be lost. In light of the applicable statute of limitations, however, these possibilities are not in themselves enough to demonstrate that appellees cannot receive a fair trial and to therefore justify the dismissal of the indictment." 92 S.Ct. at 466.

In *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), the United States Supreme Court, commenting upon the *Marion* case, stated

> "that proof of prejudice is generally a necessary but not sufficient element of a due process claim, and that the due process inquiry must consider the *reasons for the delay* as well as the prejudice to the accused." (Emphasis added.) 97 S.Ct. at 2048–2049.

The Court further stated, in commenting upon the duty of the prosecutor and the court with respect to the filing of criminal charges:

"Judges are not free, in defining 'due process,' to impose on law enforcement officials our 'personal and private notions' of fairness and to 'disregard the limits that bind judges in their judicial function.' Our task is more circumscribed. We are to determine only whether the action complained of—here, compelling respondent to stand trial after the Government delayed indictment to investigate further—violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions' * * *." (Citations omitted.) 97 S.Ct. at 2049.

In *Stoner v. Graddick,* 751 F.2d 1535, supra, the prosecution knew of the bombing of a church in 1958. There was a 19-year delay between the 1958 crime and the bringing of prosecution. The court, referring both to the *Marion* and *Lovasco* cases, applied the test stated therein requiring a showing of *actual prejudice and deliberate prosecutorial delay* to gain tactical advantage and stated that the Court's reference to

" 'the community's sense of fair play and decency,' * * * strongly hinted that bad faith was a necessary component of a successful due process challenge." 751 F.2d at 1542.

The court held that the criminal charge for the bombing should not be dismissed for due process reasons.

In *State v. Haga,* 8 Wash.App. 481, 507 P.2d 159 (1973), there was no statute of limitations governing the time for bringing a charge of murder. There was a five-year delay in filing this murder charge. All of the facts were available, but the first prosecutor did not feel they were sufficient to make a case. A subsequent prosecutor viewed the case otherwise and commenced the prosecution. The court found there was no showing of actual prejudice sufficient to

"overcome the absence of any statute of limitations concerning the crime of murder in the first degree. We hold that the showing of actual prejudice must be sufficient to overcome the legislative intent

expressed by the absence of a limitation on prosecution for such crime, before the prosecution should be forbidden." Id. 507 P.2d at 165.

We note here that the cases cited generally deal with cases in which the State, having knowledge of the commission of a crime, delays the commencement of the prosecution of that crime. The State, of course, is a party to the action. It is charged with the duty of affording the defendant due process, a fair trial, and with otherwise satisfying the requirements of the constitution and laws relating to that prosecution. The legal authorities cited provide for dismissal where the person charged is denied due process because the prosecutor delays filing charges to gain a tactical advantage, perhaps where the prosecutor acts in bad faith in delaying the filing of charges, *and* where substantial prejudice results from the delay. In this case there is not a claim that the State delayed the filing of charges. It is conceded that once the State became aware of the potential crimes with which appellant was charged, it proceeded diligently to investigate and file the charges.

The preaccusation delay here resulted because the victims did not report the crimes for the periods of time stated. Victims, of course, are not parties to the action. We are not prepared to say that they have the same duty as the State in prosecuting the defendant. The legislature has not seen fit to limit the period within which an action for sexual assault may be commenced. Rape is a crime that goes largely unreported. The reasons are obvious: the embarrassment, the humiliation, the public notoriety, the difficulty of proof, (there usually being only two persons with knowledge of the crime), and the social stigma that attaches to the crime.

In this case, Dr. Story was an authority figure, a prominent member of the community. The victims said they did not report the crime because they were scared, afraid, did not want to hurt a loved one, thought they would not be believed, or because it was their word against the word

of a doctor. Those reasons are easily understandable. There is no indication that the failure to report was for the purpose of gaining a tactical advantage or that it was done in bad faith. Nor is there any showing of substantial specific prejudice as opposed to general prejudice resulting from the passage of time and loss of memory. Specific prejudice is the showing of the loss of a witness, exhibit or other evidence, the presence of which would probably bring about a different result. In a case very close to the instant case, *Cooper v. State*, Okl.Cr., 671 P.2d 1168 (1983), there was a 14-year delay in commencing a homicide prosecution. The crime was alleged to have occurred on or about November 28, 1966, and the appellant was charged with the crime on January 16, 1980. The court noted:

"[C]rucial evidence—the incriminating statements of the appellant—did not come to the attention of the authorities until 1979 and 1980. It thus appears that the long delay in filing charges against the appellant was based on the need for proof of his guilt. To prosecute a defendant following an investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." Id. at 1175.

In this case the incriminating evidence did not come to the attention of the authorities until June 1984. After investigation, appellant was charged on October 31, 1984 with the crimes indicated. The delay was not attributable to the state of Wyoming. There is no indication of bad faith by anyone, nor is there evidence of specific prejudice. As a matter of law, there was no denial of due process nor of a fair trial in the prosecution of these charges and, therefore, no error in proceeding with the prosecution.

## ADMISSION OF EVIDENCE

### Out-of-Court Experiment

During the State's case in chief, Dr. Florey, the State's expert, testified that one could have sexual intercourse with a wom-

an lying on an examination table in the pelvic examination position. On cross-examination later in the trial, the prosecutor asked appellant whether it was physically possible to be sexually assaulted during a pelvic exam. Appellant replied, "I would have to agree with Doctor Florey that it would probably be possible." On redirect, appellant explained that intercourse on the table would require cooperation by the victim. The prosecution called Dr. Florey to the stand in rebuttal, and he repeated his prior testimony that sexual intercourse was possible. He did not say specifically whether cooperation would be required. When asked by the prosecutor why he believed it was possible, Dr. Florey answered:

"Well because * * * I had always assumed it would be possible and so my wife and I went up to the office and tried it. It is rather, on my table, it is clumsy because I can't—I'm not the right height for my table but it is a possible thing."

The prosecutor then asked Dr. Florey whether he had a table similar to appellant's adjustable table, and he responded:

"No, sir. I would assume it would be much easier on [appellant's table] because then I could adjust for the difference in height between me and [the] table."

Defense counsel moved to strike Dr. Florey's testimony on grounds that

"[i]t is completely and totally unrelated to this case and what the witness did with his wife has absolutely no bearing whatsoever on this particular table, these particular ladies and this particular circumstance."

The trial judge overruled the objection, and appellant now claims that the admission of this testimony was reversible error. He reiterates his trial objection that the experiment was irrelevant because the prosecution failed to show that the out-of-court experiment and the alleged sexual assaults occurred under substantially similar circumstances.

■ We need not decide whether the court erred in admitting Dr. Florey's testi-

mony about his "experiment" because any error was harmless.

> " 'Error in admitting evidence which has been presented by or on behalf of one party is cured where practically the same evidence * * * is elicited on cross-examination [from the objecting party.]' " *Feeney v. State*, Wyo., 714 P.2d 1229, 1230–1231 (1986), quoting 5A C.J.S. Appeal and Error § 1735(b).

When Dr. Florey compared the clumsy consensual intercourse on his table with the enhanced possibilities on appellant's adjustable table, he was merely making the point that intercourse was possible on appellant's table, a fact appellant had already admitted. Dr. Florey never implied that non-consensual intercourse was possible on appellant's table. Any error in admitting Dr. Florey's testimony was harmless.

*Semen on Tissue Paper*

The prosecution called Diana Harrison, one of appellant's receptionists, to testify about appellant's office practices. When the questioning turned to Mrs. Harrison's discovery of a piece of tissue paper in an office wastebasket which she thought contained semen, defense counsel objected on the grounds of relevancy, lack of foundation and unfair prejudice. A bench conference ensued. The prosecutor admitted that the semen would not be linked to either appellant or any of the incidents for which appellant was charged, but the court nevertheless permitted the testimony on grounds that it would show appellant's opportunity and modus operandi. The only condition the court imposed on the admission of the testimony was that Mrs. Harrison explain how she was able to identify the substance as semen.

After the bench conference, Mrs. Harrison testified that on a Wednesday in 1983, while taking the trash from the pelvic examination room, she noticed a wet tissue on the top of the trash bag. She picked up the tissue and smelled it. When the prosecutor asked her whether she associated the smell with anything, she replied: "Semen." She also testified that she discovered the wet tissue before anyone else had arrived at the office that day so she checked the appointment book to see if appellant had conducted a pelvic examination the previous afternoon. She discovered that he had.

■ We agree with appellant that Mrs. Harrison's tissue paper testimony was inadmissible under Rule 402, W.R.E. because it was irrelevant under Rule 401, W.R.E., which states that

> " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

No definitive test ever established that the substance on the tissue was semen. But, even if we accept Mrs. Harrison's opinion that it was, it is hard to see how that fact would prove anything of consequence.[1] The prosecution presented no evidence that the semen was appellant's. Nor was it established that the semen was ejaculated during a sexual assault. The district court abused its discretion when it permitted the testimony.

■ The erroneous admission of evidence

> "does not mandate reversal of a conviction in all instances. * * * For an error to be regarded as harmful, there must be a reasonable possibility that in the ab-

---

1. In *State v. Ferguson*, 100 Wash.2d 131, 667 P.2d 68, 74–75 (1983), the Supreme Court of Washington held that a woman could testify in an indecent liberties case that she thought she observed semen stains on various towels. Since her identification of the semen was only offered to the jury as the opinion of a lay witness, the court decided that it did not have to be supported by scientific testing. The jury could accept the opinion for what it was worth.

The woman had testified earlier that the defendant stepfather habitually wiped semen from his genitals with a towel after intercourse with her. And the woman's daughter, the victim, also testified that the defendant used a towel after having intercourse with her on various afternoons. The woman's testimony about the towels was relevant because it was linked to the defendant and the acts for which he was charged.

sence of the error, the verdict might have been more favorable to the defendant." *Bishop v. State*, Wyo., 687 P.2d 242, 246–247 (1984), cert. denied —— U.S. ——, 105 S.Ct. 1203, 84 L.Ed.2d 345 (1985); see also Rule 103(a), W.R.E. and Rule 7.04, W.R.A.P.

We are quite sure that the verdict would have been the same if the court had excluded the tissue testimony. The tissue testimony was inconsequential when compared with the other overwhelming evidence of appellant's guilt. Nine victims testified in great detail about the sexual assaults committed by appellant. Their testimony was often corroborated by their friends or family members who they told of the assaults. The admission of Mrs. Harrison's testimony was not prejudicial error; and, therefore, it is not a basis for reversal.

*Testimony of a Rebuttal Witness*

After the defense rested, the prosecution called LT as one of its rebuttal witnesses; but, before she could be sworn, defense counsel objected to her anticipated testimony and the court held a hearing in chambers. LT was going to testify that appellant had sexually assaulted her during a pelvic examination in 1971. Appellant was not charged with that assault so the testimony was only intended to corroborate the stories of the nine charging victims who had already testified in the prosecution's case in chief.

Defense counsel argued that LT's testimony was inadmissible character evidence under Rule 404(b), W.R.E., and more unfairly prejudicial than probative under Rule 403, W.R.E. He pointed out that LT's testimony would have little probative value because similar episodes had already been described by all nine charging witnesses. The prosecutor responded that the evidence was admissible under Rule 404(b) on grounds that it showed modus operandi, common plan or scheme, and absence of mistake by the charging witnesses. The court admitted the testimony holding that it was more probative than prejudicial and that it showed plan or motive.

LT testified that on October 14, 1971, while undergoing a pelvic examination in appellant's office, appellant attempted to insert his penis into her vagina. She never actually saw his penis because there was a surgical drape around her stomach, but she felt it with her hand. Although she could not recall many of the details of her visit, her testimony about the assault was quite specific.

Rule 404(b), W.R.E., states:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Evidence of other bad acts is suspect because it permits a jury to convict the defendant for his past crimes rather than the crime charged, it forces the defendant to prepare to defend on both the charged crime and past crimes, and it tends to be overvalued by the jury. 2 D. Louisell & C. Mueller, Federal Evidence § 136, at 129–131 (1985); see also *Bishop v. State*, supra, 687 P.2d at 249 (Cardine, J., dissenting). But this evidence is not banned entirely. While it cannot be used to prove character and a crime consistent with that character, there remains a host of permissible uses. It is not always easy to tell whether bad-act evidence is legitimately offered for one of the permissible purposes. We have, therefore, adopted a five-part test which aids that determination. We look at whether:

" '(1) The proof of the other similar crimes [is] plain, clear, and convincing.

" '(2) The other crimes [are] too remote in time from the charged offense.

" '(3) The evidence of the other crimes [is] introduced for a purpose sanctioned by Rule 404(b) of the [Wyoming Rules of Evidence].

" '(4) The element of the charged offense that the evidence of other crimes is intro-

duced to prove [is] a material issue in the case.

" '(5) There [is] a substantial need for the probative value of the evidence of the other crimes.' " *Bishop v. State*, supra, 687 P.2d at 246, quoting *United States v. Myers*, 550 F.2d 1036 (5th Cir.1977).

In their briefs, both appellant and the State treat this test as if it were a rule of evidence in its own right. They assume that if one of the factors is not present, the evidence cannot be admitted. In truth, this test is just an analytical tool. In its broad discretion a trial court might find that one of the factors is unsatisfied and still admit the evidence under Rule 404(b).

Given its erroneous belief that each part of the five-part test must be satisfied for admission of the evidence, it is not surprising that the State argues that LT's testimony successfully passed each part. Appellant counters that two parts of the test were not satisfied. He claims that LT's testimony about her sexual assault was not plain, clear and convincing and that there was no substantial need for it because evidence of nine other assaults had already been introduced.

We agree with the State that LT's specific description of her sexual assault was sufficiently clear and convincing. But the substantial need for that testimony is more problematic. This is not the typical sexual assault case in which bad-act evidence is needed to help the jury decide who is telling the truth. *Grabill v. State*, Wyo., 621 P.2d 802, 810 (1980). Each victim already had eight other victims to corroborate her story. On the other hand, we must recognize that LT's testimony was admitted during the State's rebuttal after the trial court had seen the victims testify and had heard appellant deny the crimes. At that stage in the proceeding the court was in a good position to decide whether there was a substantial need for LT's testimony which might corroborate the common plan or scheme indicated by the victims' earlier testimony. See *Carey v. State*, Wyo., 715 P.2d 244 (1986), and 2 D. Louisell & C. Mueller, Federal Evidence § 140 at 205

(1985), for a discussion of bad act evidence in rebuttal.

We hold that appellant failed to carry his burden of proving that the trial court abused its discretion when it admitted LT's testimony. *Carey v. State*, supra. That testimony showed clearly and convincingly that appellant had assaulted LT in much the same way that he was accused of assaulting the nine complainants. The common plan or scheme was material to the other charges and a permissible use under 404(b). Finally, the assault was not remote compared to the other alleged assaults.

The trial court also exercised its discretion reasonably when it held that the probative value of LT's testimony was not "substantially outweighed by the danger of unfair prejudice." Rule 403, W.R.E. While its probative value may not have been high, its potential for unfair prejudice was not very high either. Nine victims had accused appellant of sexual assault and had described each assault in great detail. It is unlikely that the jurors reached their guilty verdicts on the charged crimes while improperly intending to punish appellant for the assault on LT.

## OTHER EVIDENTIARY RULINGS

### Leading Questions

Appellant claims that the prosecutor asked 239 leading questions during the trial. He admits that defense counsel only objected to 42 of those questions, but contends that the trial court's failure to sustain those objections caused counsel to stop raising them. According to appellant, the State's reliance on leading questions deprived him of his right to confront the witnesses against him, a right guaranteed by the Sixth Amendment to the United States Constitution.

Appellant's leading-question arguments are without merit. First, appellant failed to object to all but 42 of the leading questions.

"A failure to object constitutes a waiver of whatever error occurred, unless the

error rises to the level of plain error." *Bradley v. State*, Wyo., 635 P.2d 1161, 1163–1164 (1981).

Appellant's excuse that his trial counsel stopped objecting out of futility is contradicted by the fact that the court sustained half of his leading-question objections.

Second, of the twenty leading questions which the court allowed over defense counsel's objections, eighteen were allowed for good reason. Ten of the questions were not leading when taken in context, two involved preliminary matters, three were necessary to elicit responses from a reluctant or difficult witness, and one was made up of the witness' own prior testimony so that the witness could understand the intent of a question. These are all permissible uses for leading questions under Rule 611(c), W.R.E., which states in part:

"Leading questions should not be used on the direct examination of a witness *except as may be necessary to develop his testimony.*" (Emphasis added.) See 3 D. Louisell & C. Mueller, Federal Evidence § 339 at 462–463, 466 (1979).

Finally, appellant has not carried his burden of proving that the two leading questions that might have been improperly admitted had any impact on this nine-day trial. Rule 103(a), W.R.E.

*Irrelevant Testimony*

■ Appellant contends that the trial court admitted a great deal of irrelevant evidence in violation of Rule 402, W.R.E. He claims that the court should not have permitted:

(1) Judi Cashel, one of the investigators, to describe how the victims cried when she interviewed them;

(2) Doctor Florey to describe his own examination table or his policy of having a nurse present during pelvic examinations;

(3) Mrs. Harrison to explain that appellant's examination room door could be locked from the inside; and

(4) Testimony from several victims that they reported the sexual assaults to the medical board.

All of this evidence was relevant and admissible because it tended to prove facts of consequence. Rule 401, W.R.E. The emotional distress of the victims during their interviews and their reports to the medical board enhanced their credibility, a key issue in the trial. Doctor Florey's examination table testimony was an essential foundation for his opinion that sexual intercourse could be performed on appellant's table. And Dr. Florey's policy of having a nurse present, together with Mrs. Harrison's testimony that she told appellant to get a nurse in the examination room, tended to show that appellant planned the sexual assaults. The locking door was relevant because it showed that appellant had the opportunity to perpetrate the assaults without fear of detection by his office staff or his wife who often worked in the office.

We agree with appellant that this evidence was prejudicial to his case. All evidence which proves appellant's guilt might be said to be "prejudicial," but "the key is whether it unfairly prejudiced" him. *Hopkinson v. State*, Wyo., 632 P.2d 79, 126 (1981) cert. denied, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982); Rule 403, W.R.E. Appellant has not offered cogent argument of unfair prejudice, so we will not reach that issue. *Eaton v. State*, Wyo., 660 P.2d 803, 805 (1983).

### LIMITATIONS ON APPELLANT'S DEFENSE

*Cross-Examination*

Appellant claims that on six occasions the trial court limited defense counsel's cross-examination of prosecution witnesses in violation of Rule 611(b), W.R.E., and the confrontation clause of the Sixth Amendment of the United States Constitution.[2] We will analyze each of these alleged errors in turn.

2. The Sixth Amendment states in part: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *."

### PM's Potential Bias

PM, the mother of CP (one of the complaining victims), testified on direct examination that her daughter returned in a hysterical state after a doctor's appointment with appellant. She testified that her daughter told her that appellant "had used his penis when he was examining her." On cross-examination, defense counsel asked whether PM had worked for appellant at one time. The prosecutor objected that this question was beyond the scope of direct, and the court sustained the objection. Defense counsel then moved on to other areas of inquiry.

Later in the trial, the prosecution called PM back to the stand as a rebuttal witness. She testified that she worked for appellant for a three-month period a year before appellant raped her daughter and she described appellant's office procedures. On cross-examination, defense counsel again asked her how long she worked for appellant. Apparently defense counsel wanted to show that PM was biased against appellant because he had fired her. The prosecutor objected that the question had been asked and answered, and the court sustained the objection. Defense counsel rephrased the question, and the court sustained the same objection. Defense counsel then left the subject.

■ Rule 611(b), W.R.E., allows cross-examination that exceeds the scope of direct as long as it goes to the credibility of the witness.[3] And, under some circumstances, the confrontation clause guarantees the defendant's right to engage in cross-examination on credibility issues. *Amin v. State*, Wyo., 695 P.2d 1021, 1027 (1985); *Salaz v. State*, Wyo., 561 P.2d 238, 240–241 (1977), citing *Davis v. Alaska*, 415

U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). In order to preserve error under Rule 611(b) or the confrontation clause, the defendant must make an offer of proof showing how his proposed cross-examination will impeach the witness's credibility. *Krucheck v. State*, Wyo., 702 P.2d 1267, 1272 (1985); *Cheek v. Bates*, 615 F.2d 559, 561–563 (1st Cir.1980), cert. denied, 446 U.S. 944, 100 S.Ct. 2172, 64 L.Ed.2d 800.

Rule 103(a), W.R.E., states in part:

"Error may not be predicated upon a ruling which * * * excludes evidence unless a substantial right of the party is affected, and

\* \* \* \* \* \*

"(2) * * * the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked."

In this case, defense counsel never informed the court that he intended to show PM's bias through her employment history with appellant. When, in his initial cross-examination of PM, he asked whether she had worked for appellant, his purpose could have been to elicit testimony on appellant's office practices. It was not clear, without an offer of proof, that defense counsel was attempting to attack PM's credibility.

Once PM had testified on rebuttal, it became "apparent from the context within which [the] questions were asked" that defense counsel's inquiry into PM's employment history was intended to attack her credibility. The trial court would have erred if it had prevented this inquiry even though appellant made no offer of proof. See Rule 103(a)(2), W.R.E. But this is not what occurred. The court permitted defense counsel to probe PM's relationship with appellant in depth after the court dis-

---

3. Rule 611(b), W.R.E., provides:
   "*Scope of cross-examination.*—Cross-examination should be limited to the subject matter of the direct examination *and matters affecting the credibility of the witness.* The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination." (Emphasis added.)
   In their evidence treatise, Professors Louisell and Mueller state:

   "In the very sentence which endorses the scope-of-direct limit, Rule 611(b) makes it clear that cross-examination may properly pursue 'matters affecting the credibility of the witness.' This provision amounts to an endorsement of a long-recognized rule that the scope-of-direct limit does not in any event apply to cross-questions designed to test credibility." 3 D. Louisell & C. Mueller, Federal Evidence § 336 at 433 (1979).

covered that her credibility was under attack. It barred the question about the length of PM's employment with appellant only because she had already answered it during direct examination.

"We are not aware of any authority that says a party has an absolute right on cross-examination to repeat the questions asked on direct examination." *Amin v. State,* supra, 695 P.2d at 1027.

■ In summary, the court violated neither Rule 611(b) nor the confrontation clause when it prevented defense counsel's question about PM's employment with appellant. Initially the question was not supported by an offer of proof. And when it was asked again after rebuttal, the question was merely redundant.

*TT's Credibility*

Defense counsel conducted an extensive cross-examination of TT, one of appellant's victims. He tested her memory on almost every detail of the rape. Then, at the end of cross-examination, he changed subjects. He asked her, "Do you know who Meg Anderson is?" She replied, "I do." Then he asked, "Is she a relative of yours?" and she answered, "Yes she is." At that point the prosecutor objected on grounds of relevancy, and the court called a bench conference at which defense counsel made the following offer of proof:

"[Defense counsel]: This witness has had conversations with Meg Anderson and I want to lay a foundation for impeaching her on the grounds that Meg Anderson, back in July of 1984, asked this witness to send a tape recording to Dave Wilcock [the Lovell Chief of Police]. And that her whole involvement here today is simply a matter of solicitation by her friend, Meg Anderson. I think I should be allowed to—

"THE COURT: What is the relevancy?

"[Defense counsel]: Well, the relevancy is that many of these witnesses were contacted by Meg Anderson and then asked to testify and I think that that goes to establish the circumstances of why they are testifying. I mean, I will

tell you right now, it isn't a major deal but I think that, you know, the jury is entitled to know in part why these girls are here.

\*      \*      \*      \*      \*      \*

"THE COURT: Well, I fail to see the relevancy as outlined by our discussion at the Bench and, therefore, I am not going to permit further inquiry unless Counsel can show me what the relevancy is. At this point I don't see any."

Appellant argues that Meg Anderson had a grudge against him and therefore any evidence linking her to TT would diminish TT's credibility. But defense counsel never told the court about the grudge and defense counsel never called Meg Anderson as an adverse witness. He simply said he wanted to show "why these girls [the victims] are here," and admitted that "it isn't a major deal." Given this insufficient offer of proof, we hold that the trial court did not violate either Rule 611(b), W.R.E., or the confrontation clause when it refused to admit the evidence. See 1 D. Louisell & C. Mueller, Federal Evidence § 13 at 72–73 (1977) for a discussion of vague offers of proof.

*WH's Credibility*

Defense counsel again attempted to raise Meg Anderson's grudge when cross-examining WH, one of the victims. But when the court sustained the prosecutor's objection, defense counsel simply concluded his cross-examination without making an offer of proof. The link between WH and Meg Anderson was no more apparent to the trial court than it had been during TT's testimony. There was no error in the court's ruling under these circumstances.

*Cross-examination Involving HF's Charge*

Appellant's three remaining claims of improper limit on cross-examination involve the victim HF. The first of these alleged errors occurred when the court prevented defense counsel from questioning HF about the length of appellant's penis at the time of the rape. The following exchange appears in the record:

"Q. [By defense counsel]: Now in respect to this penis, can you tell me how long it was?

"A. [By HF]: No.

"Q. Can you show me by use of your hands about—

"[The prosecutor]: I object to this. She states she doesn't know how long it was.

"THE COURT: Sustained."

A bench conference was then held at which defense counsel argued that he should not be forced to accept HF's "no" answer as conclusive but should instead be able to test her memory by propounding the question in a different manner. The court responded:

"It seems to me, Counsel, that we have established the fact for purposes of going to the jury that she testified that she did observe a penis. Does it really make any difference as to what size it is, whether it is six inches or eight inches or whatever? I will allow you to ask whether or not she saw anything else in relation to the penis such as whether or not she observed his shorts, whether it was sticking out of his trousers or some such thing like this."

Defense counsel proceeded to test HF's memory in the manner suggested by the court.

Appellant alleges that a second error occurred when defense counsel attempted to ask HF about her brother's employment with the Lovell Police Department. On direct examination, HF had testified that she did not report her rape to anyone other than her mother. She said she did not report the incident to the police because she feared that they would not believe her. Defense counsel attempted to impeach this statement on cross-examination and the following exchange occurred:

"[Defense Counsel]: Do you have any relatives on the police force in Lovell?

"[HF] No.

"Q. You don't have a brother that works for the Lovell Police?

"A. Yes, I have a brother that is a radio operator.

"Q. For who?

"A. Fire Department and the Lovell Police.

"Q. How long has he been working there?"

The prosecutor then objected that this testimony was going beyond the scope of direct examination, and the court agreed. Defense counsel then made the following offer of proof:

"We would make an offer of proof that this witness would testify that [HF's brother] has been employed at the Police Department for a number of years. And contrary to her statements that the reason she didn't report it are because of fear that that is inconsistent with having, or because nobody would believe her, that that is inconsistent with having a brother that is on the force that she could have readily confided in him. And we think that that may have probative value and goes to the impeachment as to whether or not her testimony that she did not report because she didn't think anybody would believe her is not true."

The court stood by its original ruling sustaining the prosecutor's objection. The court stated that it was not proper cross-examination because it went beyond the scope of direct.

Appellant's third allegation of error involving HF occurred during the testimony of HF's mother, MF. On direct examination MF testified that her daughter told her of the rape on the day it occurred. Defense counsel then attempted to attack MF's testimony on cross-examination by showing that MF continued to employ appellant as her doctor after she learned of her daughter's rape. He asked her, "Now, Doctor Story is also your physician; isn't he?" As MF began to answer, the prosecutor objected that the question was beyond the scope of direct, and the court sustained the objection. Defense counsel then made the following offer of proof:

"We would make an offer of proof then to show that this witness continued to treat with Doctor Story herself including pelvic examinations up to and through

the year of 1983 which is certainly inconsistent with somebody who had been informed that they had raped her daughter. We think that is probative and it is prejudicial to disallow it."

The court responded:

"I am going to have to go along with [the prosecutor's] argument that this is outside of the scope of direct. If you wish to call this witness for your case in chief you may certainly do so."

As we pointed out earlier, Rule 611(b), W.R.E., explicitly permits defense counsel to exceed the scope of direct when attacking credibility. All three of the questions to HF and MF which the district court excluded went to credibility. They should not have been excluded solely on grounds that they exceeded the scope of direct.

Appellant's conviction for assault and battery with intent to rape HF should not be reversed, however, simply because the court's evidentiary rulings were unsupported by Rule 611(b). The court's basis for excluding evidence is of no importance if the evidence is inadmissible for some other reason appearing in the record. *In re Estate of Carey*, Wyo., 504 P.2d 793, 799 (1972).

■■■ The district court excluded the inquiry into the length of appellant's penis because it was redundant and of limited probative value, not simply because it exceeded the scope of direct. While we recognize that a cross-examiner should be permitted to dislodge the witness from his initial response in some instances, we also recognize that repetitious questioning on insignificant points makes little sense. See 3 D. Louisell & C. Mueller, Federal Evidence § 334 at 415 (1979). In this case, a guessing game between defense counsel and HF would not have impeached HF's memory any more than it was already impeached by the fact that she could not remember the length of the penis. The court acted within its discretion when it suggested that defense counsel impeach HF's memory by inquiring into other details of the rape.

It is not so easy to find alternative reasons for the court's exclusion of the other two questions involving HF. HF admitted that her brother worked at the Lovell police department, but the court prevented defense counsel from asking her how long he worked there. In order to impeach HF's claim that she did not report the rape to the police because she feared they would not believe her, it was necessary for defense counsel to show when HF's brother worked at the police department. HF alleged that the rape occurred 17 years before trial and defense counsel had to show that HF's brother worked at the police department at that time. Appellant should have been permitted to establish HF's relationship with her brother, that she trusted him, confided in him, and that he helped and counselled her if that were true. This excluded cross-examination was an important part of the attack on HF's credibility. It was not repetitious or irrelevant. The court erred in excluding it.

Defense counsel's attempted cross-examination of HF's mother, MF, was also relevant and important. When defense counsel began cross-examining MF, there was already some doubt as to whether HF had really reported the rape to her. HF told the prosecutor prior to trial that she had never reported the rape to anyone else. But at trial, she said that she told MF about it right after it occurred.

If defense counsel could have shown that MF continued to visit Dr. Story after she allegedly learned of her daughter's rape, MF's credibility would have been sorely tested. The court obviously realized that this line of cross-examination was relevant because the court suggested that defense counsel raise the issue in its case in chief. But this procedure does not cure the court's error. Defense counsel should not be forced to call a witness back to the stand later in the case in order to attack his credibility. If a witness's misstatements are not demonstrated immediately, they can color the jury's view of the other evidence which follows. Defense counsel's eventual attack on the witness's credibility may come too late. And where the witness

is recalled by defense counsel, it is not for cross-examination but in his case in chief. He may be denied cross-examination and, if allowed, may have to review again all the unfavorable testimony of the witness in order to set the stage for examination upon credibility. The examination then would surely lose effect. Finally, the witness will have had considerable time to prepare for cross-examination which defeats its purpose. It was error for the court to deny to defense counsel the opportunity to timely cross-examine MF about her continued visits to Dr. Story.

Evidentiary errors can be harmless, and the burden is on the appellant to demonstrate that those errors are prejudicial. *Bishop v. State*, supra, 687 P.2d at 246. But before analyzing the harmfulness of the error, we must decide whether appellant's constitutional right of confrontation was also violated. If it was, the harmfulness of the error must be analyzed under much stricter standards.

Although a trial court has some discretion to control cross-examination

" 'this discretionary authority * * * comes into play only after there has been permitted as a matter of right sufficient cross-examination to satisfy the Sixth Amendment.' " *United States v. Lindstrom*, 698 F.2d 1154, 1160 (11th Cir. 1983), quoting *Greene v. Wainwright*, 634 F.2d 272 (5th Cir.1981).

It is easy to find a Sixth Amendment violation when a trial court has barred all cross-examination of a witness, but in cases like this one, where extensive cross-examination was permitted, it is necessary to find the Sixth Amendment threshold.

Our search for the Sixth Amendment threshold must begin with the most significant case in this area, *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974), in which the Supreme Court reversed a burglary conviction because of excessive interference with the defendant's right of cross-examination. The Court stated:

"Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, *the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness.* * * * A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.' We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." (Citation omitted).

This court's interpretation of the scope of the Davis case has not always been consistent. In *Connor v. State*, Wyo., 537 P.2d 715, 717 (1975), we stated in dictum that Davis only established the defendant's constitutional right to cross-examine on issues of bias and prejudice, not general credibility.[4] We reiterated this view in *Salaz v. State*, supra, 561 P.2d at 241. But recently, in *Amin v. State*, supra, 695 P.2d 1021, we seemed to recognize that the cross-examination right extends beyond bias and prejudice. We quoted the following statement with approval:

" 'The right of cross-examination cannot be substantially restricted. "It is not satisfied by 'token interrogation' and includes the right to fully cross-examine the witness on *any* material matter which would bear on the creditability of the witness." ' " (Emphasis added.) Id. at 1027, quoting *Valentine v. State*, Miss., 396 So.2d 15 (1981).

This quotation accurately reflects the Supreme Court's decision in *Davis v. Alaska*,

---

4. The real holding in *Connor v. State*, Wyo., 537 P.2d 715 (1975), was that the defendant did not preserve any error for appellate review because he failed to make an offer of proof.

supra. As interpreted in Davis, the confrontation clause guarantees a wide range of discrediting cross-examination and is not limited to attacks on bias.

This is not to say that there can be no limits on cross-examination.

"Confrontation questions must be resolved on a case-by-case basis based on examination of all circumstances and evidence." *Chipman v. Mercer*, 628 F.2d 528, 530 (9th Cir.1980).

The trial court can prevent harassing or repetitive questions, *Davis v. Alaska*, supra, 94 S.Ct. at 1110, and

" 'some topics may be of such minimal relevance that the trial court would be justified either in totally prohibiting cross-examination about them or in allowing only limited questioning.' " *Chipman v. Mercer*, supra, 628 F.2d at 531, quoting *Skinner v. Cardwell*, 564 F.2d 1381, 1389 (9th Cir.1977), cert. denied 435 U.S. 1009, 98 S.Ct. 1883, 56 L.Ed.2d 392 (1978).

■ In this case these qualifications apply only to the restrictions on questions about the length of appellant's penis. The trial court committed constitutional error when it prevented the questions about the employment history of HF's brother, her relationship with him, and the continuing office visits by HF's mother. If cross-examination is to be the crucible which produces the truth and protects the innocent, this kind of inquiry must be guaranteed under the confrontation clause as well as the rules of evidence. Appellant's conviction for assault and battery with intent to rape HF must be reversed unless we can say that the court's erroneous evidentiary and constitutional rulings were harmless.

Many state and federal courts have held that constitutional error of this type can never be harmless. *Skinner v. Cardwell*, 564 F.2d 1381, 1388–1389 (9th Cir.1977); 1 D. Louisell & C. Mueller, Federal Evidence § 23 at 144 n. 55 (1977). They have based this conclusion on the following statement

made by the Supreme Court in *Davis v. Alaska*, supra, 94 S.Ct. at 1111:

"Petitioner was thus denied the right of effective cross-examination which ' "would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it." *Brookhart v. Janis*, 384 U.S. 1, 3, 86 S.Ct. 1245, 1246, 16 L.Ed.2d 314 [1966].' *Smith v. Illinois*, 390 U.S. 129, 131, 88 S.Ct. 748, 750, 19 L.Ed.2d 956 (1968)."

However, other courts have employed a harmless-error analysis. E.g., *Reed v. United States*, D.C.App., 452 A.2d 1173, 1176–1177 (1982), cert. denied, 464 U.S. 839, 104 S.Ct. 132, 78 L.Ed.2d 127 (1983).

The United States Supreme Court has recently held

"that the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to *Chapman* harmless-error analysis. [*Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).] The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Delaware v. Van Arsdall*, —— U.S. ——, ——, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986).

■ Appellant has raised his confrontation-clause arguments under the Sixth Amendment to the United States Constitution, so we will limit our harmless-error analysis to the rule enunciated by the Su-

preme Court.[5] It would be impossible for us to conclude that the trial court's restrictions on defense counsel's cross-examination of HF and MF were harmless beyond a reasonable doubt. HF's accusation was not corroborated by any physical evidence or by the testimony of any witness other than MF. The jury's decision that appellant assaulted and battered HF with intent to rape her was based entirely on the testimony of HF and MF. Their credibility was crucial to the prosecution's case.

Even without the excluded cross-examination, the prosecution's case against appellant for the rape of HF was not very strong. It is clear from the jury's decision that it disbelieved some of HF's testimony. HF testified that appellant penetrated her vagina with his penis, but the jury did not convict him of raping her. Instead, the jury found him guilty of the lesser-included offense of assault and battery with intent to rape. If HF and MF had been subjected to the cross-examination which was improperly excluded, there is a reasonable doubt as to whether appellant would have been convicted of even the lesser-included offense. The error was not harmless beyond a reasonable doubt. We reverse appellant's conviction, under count I of the amended information, for assault and battery with intent to rape HF.

*Surrebuttal*

■ Appellant alleges that the trial court committed two errors involving surrebuttal. First, according to appellant, the trial court should have permitted him to call several witnesses who would have cast doubt on the rebuttal testimony of LT. LT had testified about an uncharged sexual assault that appellant committed against her in 1971. The court expressly allowed appellant to take the stand in surrebuttal to contradict LT's story, and appellant did not object to that limitation on his surrebuttal. Because appellant failed to object and because we can see no possibility of plain error, we will not consider this al-

leged error on appeal. *Schmunk v. State*, Wyo., 714 P.2d 724 (1986); Rule 103(a)(1), W.R.E.

■ Second, appellant contends that the trial court should have permitted his defense attorney to call a surrebuttal witness who would have refuted the rebuttal testimony given by Judi Cashel, a police investigator. On rebuttal, Ms. Cashel testified that when she conducted a warranted search of appellant's office she did not find any gloves which could have made his fingers appear to be a penis. Defense counsel requested permission to call a witness who would point out a box of disposable gloves appearing in a photograph of appellant's office. The photograph had already been introduced as an exhibit. The court denied the request on grounds that this surrebuttal was old evidence that could have been introduced in appellant's case in chief.

The trial court's characterization of appellant's proposed evidence is essentially correct. On direct examination, in an effort to convince the jury that the victims had mistaken a gloved hand for a penis, appellant had demonstrated his use of disposable gloves and white phisohex fluid during pelvic examinations. He had told the jury that he kept the gloves in a cabinet in his examination room. He could have shown the photograph to the jury during his testimony and pointed out the box of disposable gloves. The photograph's only value on surrebuttal would have been to fortify his statement that he kept the gloves in the room.

In *Janski v. State*, Wyo., 538 P.2d 271, 279 (1975), we quoted the following rule from *State v. Alexander*, 78 Wyo. 324, 324 P.2d 831, 839 (1958):

" 'While it is true * * * that new facts brought out on rebuttal may properly be met by surrebuttal evidence, that rule does not permit surrebuttal merely to supply evidence which could have been

---

5. Article 1, § 10 of the Wyoming Constitution contains a confrontation clause identical to the clause found in the federal constitution. This court could hold that the Wyoming confronta-

tion clause is more protective than the federal clause and could establish an error per se rule for violations of the state provision. We do not here choose to consider that alternative.

given in chief or to cumulate additional evidence or to fortify evidence already given, or to supplement such evidence because it has been impeached upon rebuttal.' "

This rule applies perfectly in this case. The trial court committed no error when it prevented appellant's cumulative surrebuttal regarding the photograph.

*Evidence on the Theory of the Defense*

The theory of the defense was that a woman could mistake the sensations of a normal bimanual pelvic examination for a sexual assault, could mistake the sight of a gloved hand for an erect penis, could confuse examination lubricants with semen, and could misunderstand normal examination room conversation. Appellant testified about these topics himself and called five other witnesses who also discussed them.

Kathy Gifford, one of appellant's nurses, described his normal examinations. She explained that he used flesh-colored disposable gloves and cream-colored phisohex. She also testified that there was often a discharge from a patient's vagina that had to be wiped off with a tissue.

Judy Gifford, a patient of appellant's who also worked for him as a nurse, confirmed her sister-in-law's testimony about the gloves and phisohex. She described appellant's bimanual examination procedures in great detail, explaining that he would ask his patients whether they could "take any more," and whether he could "go any deeper," the same words appellant allegedly used during the sexual assaults. She also stated that he sometimes injected warm medications which the patients could feel as it entered their vaginas. Finally, she described the vaginal discharge which she said was commonly associated with the examinations.

Appellant's next witness, Jacqui Bischoff, was a nurse at the Big Horn Hospital and one of appellant's patients. After testifying about appellant's reputation, defense counsel asked her to compare the pelvic examinations she received from appellant with those she had been given by other doctors. The prosecutor objected on relevancy grounds, but the court allowed her to answer. She said there was no difference. Defense counsel then attempted to inquire about the specific differences, the prosecutor objected, and the court held a bench conference.

Defense counsel explained that Ms. Bischoff's testimony was relevant because it showed that there were more than just one or two patients who received uneventful pelvic examinations from appellant. When the court asked where the line would be drawn, defense counsel stated that six more witnesses would be called to discuss their normal examinations. Appellant was entitled to nine witnesses, according to the defense, because nine victims had testified for the prosecution. The court ruled that the testimony of those additional six witnesses would be cumulative but it permitted the defense to continue its interrogation of Ms. Bischoff.

Despite the court's ruling, defense counsel asked another one of appellant's patients, Robyn Winland, about her normal pelvic examinations. When the prosecutor objected, the court called a bench conference. Defense counsel informed the court that Ms. Winland would describe her vaginal secretions, the words used by appellant, and the manner in which appellant's clothing brushed against her. The court stood by its prior ruling and held that the testimony about the secretions and language was cumulative. The defense was permitted to inquire about the clothing, however, because it was new evidence.

Appellant contends that the court abused its discretion by limiting the introduction of evidence on this theory of the case. The State counters that the evidence was properly excluded as cumulative. Rule 403, W.R.E., states in part:

"Although relevant, evidence may be excluded * * * by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Like other evidentiary rulings, a trial court's decision to exclude evidence under Rule 403 will only be overturned for clear

abuse of discretion. *Towner v. State,* Wyo., 685 P.2d 45, 49 (1984); *McCabe v. R.A. Manning Construction Company, Inc.,* Wyo., 674 P.2d 699, 711 (1983).

"However, Rule 403 is an extraordinary remedy which should be used sparingly since it allows the court to exclude evidence which is concededly relevant and probative. Its major function is to exclude scant or cumulative evidence which may be unfairly prejudicial, confusing, or needlessly cumulative." *Towner v. State,* supra, at 49.

■ We agree with the State that the court exercised its discretion wisely under the circumstances. The court permitted appellant and three other witnesses to testify freely about the examination procedures that the victims might have misconstrued. The court was careful to exclude only the evidence which was actually cumulative. The court did not have to allow appellant nine witnesses just because there happened to be nine victims who testified for the prosecution.

■ Appellant's final claim of improper limits on his defense involves the testimony of his expert, Dr. Douglas Wrung. Although Dr. Wrung was permitted to testify about vaginal discharges after normal pelvic examinations, he was not allowed to describe the procedures which, in his opinion, a female patient might mistake for a sexual assault. Specifically, defense counsel asked Dr. Wrung:

"In your experience relative to conducting pelvic exams are there any particular procedures that come to mind that in your opinion are capable of being misinterpreted by a patient?"

The court sustained the prosecutor's objection that any answer to this question would be speculative.

Rule 702, W.R.E., permits expert opinion testimony if it

"will assist the trier of fact to understand the evidence or to determine a fact in issue."

In addition, the expert's opinion must be based on facts which he has personally perceived, which were introduced at the hearing, or are reasonably relied upon by experts in his field. 3 D. Louisell & C. Mueller, Federal Evidence § 388 at 654–655 (1979).[6]

"Rule 703 does not abdicate judicial responsibility to the expert, for it leaves room for rejection of testimony if reliance on the facts or data is unreasonable: The Rule in effect directs the trial judge to accord deference to the expert's explanation of what is reasonable, but it does not require the trial judge to accept what amounts to wishful thinking, guesswork, or speculation." Id., § 387 at 652.

Although Dr. Wrung might have described many examination procedures with which he was familiar, he could not link those procedures with physical sensations he had personally experienced. His opinion would have been nothing more than speculation which could have misled the jury. See *Krucheck v. State,* supra, 702 P.2d at 1271. If there was some study of female patients showing that some examination procedures could be mistaken for intercourse, then Dr. Wrung might have had a proper basis for an opinion. But defense counsel never made an offer of proof demonstrating such a basis. Under the circumstances, the testimony was properly excluded.

## PROSECUTORIAL MISCONDUCT

*Instructing the Witnesses not to Talk to the Defense*

Fearing that the State's witnesses were being harassed during the investigatory stage of the proceedings, the prosecutor instructed them not to talk to anyone without his approval. Defense counsel made a

---

6. Rule 703, W.R.E., states:
   "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

motion to compel the State to refrain from so instructing its witnesses. The court granted the motion and issued the following order:

"IT IS HEREBY ORDERED that the Big Horn County Prosecuting Attorney, his agents or employees, refrain from instructing any and all witnesses not to talk to or be interviewed by the Defendant's attorneys, agents or employees.

"IT IS FURTHER ORDERED that any interviews conducted by the Defendant's attorneys, agents or employees of the State's witnesses be recorded electronically for the Court's review; that the interviews be conducted discretely and in a non-harassing manner; that the State's witnesses may grant interviews to Defendant's attorneys, agents or employees but are not ordered to do so.

"IT IS FURTHER ORDERED that a copy of this Order be furnished to each witness at the time the Defendant's attorneys, agents or employees attempt to interview them."

Right after the hearing on defense counsel's motion to compel, the prosecutor sent a letter to the witnesses explaining the court order. Consistent with their right under the court order, all but two of the witnesses refused interviews by defense counsel. The defense moved for a continuance on grounds that it needed more time to interview the witnesses, and the court granted it. The record does not indicate whether the continuance allowed defense counsel to successfully conduct additional interviews.

■■■ Appellant claims that the prosecutor's initial instructions to the witnesses and his letter explaining the court order amounted to prosecutorial misconduct which justifies reversal. We agree that it was misconduct for the prosecutor to instruct the witnesses as he did.

"A prosecutor should not discourage or obstruct communication between prospective witnesses and defense counsel. It is unprofessional conduct for the prosecutor to advise any person or cause any person to be advised to decline to give to the defense information which such person has the right to give." Standards for Criminal Justice, Standard 3-3.1(c) (American Bar Association 1980).

But misconduct alone does not justify reversal.

"A party alleging prosecutorial misconduct has the burden of proving that he was substantially prejudiced by any misconduct that takes place." *Capshaw v. State*, Wyo., 714 P.2d 349, 352 (1986). Appellant has not listed the witnesses who never gave an interview. Nor has he shown us how he would have changed his trial strategy or cross-examination tactics if he had been able to interview more of them. He has failed to carry his burden of showing prejudice. Although we do not approve of what occurred here, it is not a basis for reversal.

### Disclosure of Exculpatory Material

Appellant claims that the prosecution failed to disclose exculpatory material when it failed to reveal the name of the patient who received a pelvic examination the night before Mrs. Harrison found the alleged semen-soaked tissue in the wastebasket. But appellant does not explain how this information would have been exculpatory. As far as we know, this patient may have been sexually assaulted on the previous evening. Appellant's argument lacks the necessary cogency without some indication that the material was truly exculpatory. We need not consider it. *Eaton v. State*, supra, 660 P.2d at 805.

### Leading Questions

Appellant claims that the prosecutor engaged in misconduct by asking many improper leading questions. In our earlier discussion of the leading questions, we concluded that the vast majority were proper. There was no misconduct here.

### Unprofessional Remark

During the prosecution's redirect examination of Mrs. Harrison, defense counsel requested a bench conference. The record indicates that the prosecutor directed the following remark to the jury: "I am going

to object to these Bench conferences." At the bench conference the court admonished the prosecutor to confine his remarks to the court, and the prosecutor apologized for his remark. Appellant now claims that this comment amounted to serious prosecutorial misconduct.

■ We agree with appellant and the trial court that the prosecutor should not have made the statement. But there are bound to be minor indiscretions like this at many trials.

"[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by doing so can it be determined whether the prosecutor's conduct affected the fairness of the trial." *United States v. Young*, — U.S. —, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985).

Appellant has not shown that this mistake had any impact on his conviction, so it does not justify reversal. *Capshaw v. State*, supra, 714 P.2d 349.

■ Appellant also complains about the following statement made by the prosecutor in closing argument:

"I want to counter a few of the cheap shots, the insinuations, the distortions and misstatements made in that final argument."

But defense counsel did not object to the statement when it was made.

"[T]he general rule in Wyoming is that the failure to timely interpose an objection to improper argument is treated as a waiver, unless the misconduct of the prosecutor is so flagrant as to constitute prejudicial error * * *." *Jones v. State*, Wyo., 580 P.2d 1150, 1153 (1978).

Even if the prosecutor's argument was improper, which we doubt, it was certainly not so flagrant as to justify reversal without an objection. Appellant's various claims of prosecutorial misconduct are without merit.

## JURY INSTRUCTIONS

### Cautionary Instruction

The court gave the following jury instruction:

"You are instructed that a conviction of rape may be had on the uncorroborated testimony of the victim."

Defense counsel requested that a cautionary instruction be given to counterbalance this instruction and offered the following:

"You are instructed that a charge of a nature preferred against the Defendant is as a rule easily made, but hard to prove and is equally difficult to disprove. From the very nature of the case, the complaining witness or the prosecutrix and the Defendant are generally the only witnesses, and while the law does not require in this class of cases that the prosecuting witness be corroborated before you can convict, it does require that you examine and weigh her testimony with care and caution and give the Defendant a benefit of every reasonable doubt."

In a long series of Wyoming cases we have held that if the court instructs the jury that it may convict the defendant upon the uncorroborated testimony of a rape victim, then it should also caution the jury to view the victim's testimony with care. *Kennedy v. State*, Wyo., 470 P.2d 372, 375 (1970), cert. denied, 401 U.S. 939, 91 S.Ct. 933, 28 L.Ed.2d 218 (1971); *State v. Koch*, 64 Wyo. 175, 189 P.2d 162, 168 (1948); *State v. Slane*, 48 Wyo. 1, 41 P.2d 269, 272 (1935). This rule was most recently tested in *Lopez v. State*, Wyo., 544 P.2d 855 (1976), but we did not decide whether the instruction was still required because such a ruling was unnecessary. We affirmed the district court's refusal to give the instruction because the testimony of the victim was corroborated—an exception which has always been applied to the rule. *Lopez v. State*, supra, at 865.

In this case, appellant failed to make a timely objection to the court's refusal to give the instruction. Rule 31, W.R.Cr.P., states that

"[i]nstructions to the jury shall be given and objections thereto made at the time and in the manner provided for the giv-

ing of instructions and the making of objections thereto in the Wyoming Rules of Civil Procedure."

In turn, Rule 51, W.R.C.P., states:

"No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

At the close of the evidence the parties adjourned to the court's chambers. At that time the court stated:

"Parties have agreed that they will put their objections and reservations to the instructions after the same have been submitted to the jury and the Defendant has reserved the right to object to some instructions that have not been given and to instructions that may have been given."

The parties returned to the courtroom, and the judge instructed the jury. Appellant objected to the way one of the instructions was read, and the court reread it. But appellant did not object to the absence of the cautionary instruction. Closing arguments were then presented, the jury began deliberations, and then the parties returned to chambers to make their objections to the instructions.

■ Once the jury began deliberations, it was too late for appellant to object to the instructions. Rule 51, W.R.C.P., is designed to allow "the court to correct itself or modify an instruction to meet some well-taken objection." *Runnion v. Kitts*, Wyo., 531 P.2d 1307, 1312 (1975); see also *Morris v. State*, Wyo., 644 P.2d 170, 171 (1982). That purpose cannot be achieved if the objections are made after deliberations have begun, regardless of what procedure the parties have agreed to adopt. Appellant's violation of Rule 51 cannot be excused. *Morris v. State*, supra, at 171.

In this case we could tacitly prolong the life of the cautionary instruction by basing our decision entirely upon appellant's tardy objection. Sometimes it is wise for an appellate court to avoid a difficult substantive issue that is not central to a case. This is especially true when the issue has not been carefully briefed by the parties or the facts have been poorly developed in the record. In this case, however, the parties have briefed the issue thoroughly in the context of a well-developed record.

Moreover, this question has created confusion at the trial level and is capable of repetition but evades review. *Lopez v. State*, supra, 544 P.2d at 870 (Raper, J., concurring). There is much to be gained by a forthright decision on the merits of the issue. See *Lopez v. State*, supra, 544 P.2d at 865–866 (Raper, J., concurring).

In the 1670's, when the cautionary instruction was created, rape was a capital crime. There was an extreme reluctance to convict because the penalty was so enormous. There is little reason today, given the present penalties, to single out rapists for special treatment and rape victims for special scrutiny on the witness stand.

"When [sexual assault] prosecutions present close evidentiary questions, they do so not because a victim—generally a woman—claims to have been sexually assaulted or abused, but because the alleged crime took place in evanescent circumstances difficult to reconstruct in court, a happenstance which may plague prosecution of any crime involving specific intent, and which is indeed a typical occurrence in such nonsexual crimes as fraud and narcotics transactions." *Lopez v. State*, supra, 544 P.2d at 868 (Raper, J., concurring), quoting *People v. Rincon-Pineda*, 14 Cal.3d 864, 123 Cal. Rptr. 119, 538 P.2d 247, 260 (1975).

"Because a witness may be a rape victim is no reason why she should be visited with condemnation, on the one hand, or clothed with sanctity, upon the other." *Lopez v. State*, supra, 544 P.2d at 869 (Raper, J., concurring) citing *Taylor v. State*, 257 Ind. 664, 278 N.E.2d 273 (1972).

The cautionary instruction is inaccurate when it says that rape is easy to charge. "The *Uniform Crime Reports* note that of all the Crime Index offenses, rape is proba-

bly the crime most under-reported by victims to police." J.M. MacDonald, Rape Offenders and their Victims, at 26 (3rd printing 1979). In 1983, 55% of the rape victims reported the crime to police, while 63.6% of the robbery victims, 62.3% of the aggravated assault victims, and 64.9% of purse snatching victims reported those crimes. Bureau of Judicial Statistics, U.S. Dep't of Justice, Criminal Victimization in the United States, 1983 at 85 (1985).

The instruction is also incorrect in stating that rape is hard to disprove. According to FBI statistics comparing rape prosecutions with prosecutions of other violent crimes, rape is one of the most difficult to prosecute successfully. *Lopez v. State,* supra, 544 P.2d at 868.

■ In summary, the instruction has outlived its usefulness, discriminates unfairly against certain victims, and is based on inaccurate premises. It can only distract the jury from its duty as fact finder. The cautionary instruction should no longer be given, even when the rape victim's testimony is uncorroborated.

It should be noted also that the jury can be misled by an instruction to the effect that it can convict the defendant solely on the victim's uncorroborated testimony. Rather than give this instruction and balance it out with a cautionary instruction, the district courts should give neither instruction. The victim's uncorroborated testimony should be neither highlighted nor denigrated.

*Lesser-included Offense Instructions*

■ Appellant claims that the court invited the jury to reach a compromise verdict when it gave instructions on lesser-included offenses which were not supported by the evidence. He also argues that the instructions themselves were deficient. As we pointed out earlier, defense counsel did not preserve any instructional error for our review because he voluntarily withheld his objections until after the jury began deliberations. We can reverse appellant's conviction based on this alleged error only if we can find plain error. *Britton v. State,* Wyo., 643 P.2d 935, 937 (1982).

"The requirements for plain error are that the record must be clear as to what happened at the trial level, the error must involve a clear rule of law, and the facts of the case must clearly violate the rule. Once these requirements are met, the appellant still bears the burden of showing that a substantial right was adversely affected." Id.

We cannot say that the rule of law, which appellant claims the court violated, is clear. The trial court must apply a five-part test to decide whether to instruct on lesser-included offenses. *State v. Selig,* Wyo., 635 P.2d 786, 790 (1981). Several parts of the test require factual analysis by the court—precisely the kind of analysis which can profit from the parties' objections and arguments. The court did not have the benefit of those objections at a time when the claimed error could be corrected. In any event, we cannot say that there was a clear violation of a rule of law as would give rise to plain error. There being no plain error, the court's decision to give the lesser-included-offense instructions is not a ground for reversal.

### CONCLUSION

Appellant's conviction for assault and battery with intent to rape HF is reversed. The five other convictions are affirmed.

THOMAS, Chief Justice, concurring and dissenting, with whom BROWN, Justice, joins.

I am constrained to dissent from the conclusion of the majority of the court that Story's conviction for assault and battery with intent to rape H.F. is reversed. That reversal is premised upon the refusal of the trial court to permit inquiry of H.F. with respect to how long her brother had been working for the Lovell Police Department. The fact that H.F.'s brother worked for the Lovell Police Department was brought out and the critical and material information was established. I cannot perceive how Story was inhibited from making the point with the jury that H.F. had testified that she did not report this offense to the Lovell police because she feared that they would

not believe her and yet that she did have a brother who worked as a radio operator for the Lovell Police Department. It is my view that the impeachment which Story complains he was foreclosed from accomplishing in fact had occurred. I am not persuaded that it was necessary for defense counsel then to show the exact dates when the brother worked at the police department.

The majority opinion goes on to rely upon a statement that Story should have been permitted to establish H.F.'s relationship with her brother, that she trusted him, confided in him, and that he helped and counseled her if that were true, but the difficulty with this statement is that it does not appear that Story ever made that offer of proof. Furthermore, no apparent attempt was made even to ask questions about these latter matters.

Because I am not persuaded that there was any error with respect to limitation of cross-examination upon which the majority relies to reverse this conviction, I cannot agree with that portion of the majority opinion discussing the concept of harmless error with respect to limitations upon cross-examination.

I would affirm Story's conviction on all six charges.