**Paul Albert FRENZEL, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. 92–96.**

Supreme Court of Wyoming.

March 26, 1993.

Before MACY, C.J., THOMAS, CARDINE and GOLDEN, JJ., and URBIGKIT, J. Retired.

CARDINE, Justice.

Appellant challenges his conviction of seven separate counts of first degree sexual assault (W.S. 6–2–302). He argues that the State's expert improperly testified concerning the victim's credibility and concerning "Child Sexual Abuse Accommodation Syndrome." Additionally, appellant alleges that several of the State's other witnesses improperly testified to the victim's rendition of the assaults and on the defendant's prior bad acts.

We affirm.

Appellant presents the issues as follows:

I. Did the trial court err when it allowed the psychologist to vouch for the veracity of the State's complaining witness?

II. Did the trial court err in allowing prosecution witnesses to recite the allegations of the accuser, even though those recitations were not for the purpose of refuting an allegation of recent fabrication?

III. The trial court erred in allowing the psychologist to testify that the complaining witness suffered from a "syndrome" which could only be the result of the offenses alleged, when that syndrome is not generally recognized in the field of psychology.

IV. The trial court erred in allowing evidence of other "bad acts" which were not admissible under Rule 404(b), W.R.E.

In addition, the State raises a fifth issue:

V. Must the victim's compensation surcharges be modified?

Michael J. Krampner (argued), Casper, and Donna S. Sears, Lander, for appellant.

Joseph B. Meyer, Atty. Gen., Sylvia Lee Hackl, Deputy Atty. Gen., Barbara L. Boyer, Sr. Asst. Atty. Gen., Theodore E. Lauer, Director, Prosecution Assistance Program, and Michael M. Robinson (argued), Student Intern., for appellee.

## BACKGROUND

For a complete understanding of the contentious testimony in this case, it is necessary to briefly describe the parties involved and their relationship to one another. It is easiest to keep track of the parties by their connection to the appellant.

Appellant has two siblings, a sister, age 47 (T–1) and a brother, age 44 (B–1). Both of these siblings live in California and evidently have done so for most of their adult lives. The man to whom T–1 had been married for twenty-five years is now married to the appellant's second daughter (D–2), the prosecutrix. T–1's husband mistakenly believed that he was divorced from T–1 when he married D–2.

Appellant has fathered children with four separate women. He and his first wife (W–1) produced one child, a daughter (D–1). Appellant and his second wife (W–2) produced D–2 (the prosecutrix) and a third daughter (D–3). Appellant became separated from W–2 and began a non-marital relationship with another woman (W–3) which produced three sons (S–1, S–2, S–3). Appellant then became estranged from W–3 and has since begun a new relationship with another woman (W–4) and produced another son (S–4).

In the Fall of 1989, appellant, W–4, D–2, D–3, S–1, S–2 and S–3 all moved to Cody, Wyoming. At the time, appellant was 44, W–4 was 18, D–2 was 17, D–3 was 15, S–1 was 10, S–2 was 8 and S–3 was 5. They moved into a trailer home six miles outside of town. The testimony is disputed as to when the children started school, but at some point all the children did attend school in Cody. Appellant worked periodically cleaning carpets and driving a truck. The prosecutrix (D–2), went to school occasionally and worked at a local fast food restaurant.. It was during this approximate five-month stay in Cody when D–2 claims the sexual abuse occurred.

During the family's five-month stay in Cody, appellant allegedly committed seven different acts of first degree sexual assault on his daughter, D–2. Four separate incidents account for each of the seven assaults. Each assault involved forced penetration either orally or vaginally with the appellant's penis or another object.

Within a few days of the last assaults, appellant moved his family back to California. Once in California, appellant and W–4 moved to Los Angeles and both D–2 and D–3 moved in with D–1. While in Califor-

nia, D–2 was arrested on a warrant issued in Park County, Wyoming for bad checks she wrote in Cody. The Park County sheriff and his wife travelled to California to bring D–2 back to face the check writing charges. It was on this trip back to Wyoming when D–2 first began to relate her sexual abuse history to the authorities.

In our discussion of the alleged trial errors, we will further relate the relevant facts as necessary.

## DISCUSSION

### Clinical Psychologist's Expert Testimony

Appellant makes two challenges to the admission of expert testimony from the State's expert. First, he argues that the testimony was the equivalent of vouching for the victim's credibility. Second, appellant asserts that the expert should not have been permitted to testify concerning the "Child Sexual Abuse Accommodation Syndrome" (CSAAS). Both of these objections are premised on W.R.E. 702 which permits admission of expert testimony only if it will assist the trier of fact. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Appellant correctly asserts that expert opinion which vouches for the victim's credibility violates W.R.E. 702. *Montoya v. State*, 822 P.2d 363, 365 (Wyo.1991); *citing Zabel v. State*, 765 P.2d 357 (Wyo. 1988). Then appellant argues that expert testimony which discusses CSAAS violates W.R.E. 702 because CSAAS is not generally recognized in the field of psychology and thus is not sufficiently reliable to assist the jury.

In order to properly address these issues, it is necessary to understand the content of the expert's testimony. Dr. Ned Tranel was qualified as an expert in child psychology and child sexual psychopathology.

The relevant testimony developed as follows:

[Dr. Tranel]: There is, when one encounters a condition of child sexual psychology, child sexual abuse accommodation syndrome and a syndrome refers to a pattern of behaviors which are called symptoms, and in order for this syndrome to exist, then we look at the presence of or question whether they are, there is evidence of certain characteristics or symptoms, and there are five of these.

[Prosecutor]: Could you list those?

[Dr. Tranel]: * * * [F]irst one is secrecy * * *. The second one is a sense of hopelessness, and the reason that's relevant is because there is usually a child involved and usually the perpetrator is an adult * * *.

The third characteristic is a pattern of accommodation, * * * which enables the person to survive over a long period of time * * *.

The fourth characteristic is delayed reporting. Sometimes disclosure is used instead of reporting, and reporting is delayed and conflicted, and the reason for this, and in this case there is a classic pattern here[.]

> *　　*　　*　　*　　*　　*

The last characteristic we find in this syndrome is retraction or sometimes called recanting or taking back the disclosure of the sexual abuse * * *.

So those are the five characteristics of this child's sexual abuse accommodation syndrome as it's called.

After being admitted as an expert, Dr. Tranel continues his dissertation:

[Prosecutor]: And could you tell us, you mentioned about the child accommodation syndrome, what patterns of behavior manifested by [the victim] and the testing results indicated whether or not she may fit within that particular syndrome?

[Dr. Tranel]: Yes. I listed the symptoms there and then I looked at the test data from my evaluation to determine whether those, whether there was consistency, and as I indicated, there was. There was evidence that this was, I use the term classic pattern, there was, first of all, the secrecy that I mentioned, and that was re-enforced by the abortive attempt that she made early on to disclose the pattern of abuse. She first attempted to report this to her grandmother who didn't believe her and called her a liar. She made another abortive attempt to report this to her uncle, * * * who believed her but then also participated in the abusive pattern, and there were other abortive attempts during her academic career but none of them were followed through on with any length of time because, mainly because of the frequent and sudden moves that characterized her life throughout her academic career. So the secrecy was sustained until, I have it in my note, I don't recall the exact date, it was returning from California to Wyoming with the Sheriff or Deputy, and that finally led to disclosure, which was pursued more diligently. The second feature I mentioned was the helplessness, and that was part of the environment in which she lived as well as the relationship between her and the abusers, those including her father, her grandfather, and her uncle. All of them, of course, older and bigger, plus she was experiencing the helplessness associated with a pattern of extreme poverty and cultural deprivation and academic failure, and she had no opportunity to overcome that and feel good about herself.

> *　　*　　˙*　　*　　*　　*

Then the third thing was the entrapment or the accommodation where she eventually learned techniques for surviving or living with this continuing pattern, and one of the techniques she used or typically was to react initially with aggression and fighting and succumb and adapt and assume a passive stance as things continued on.

Then the next thing was the delayed disclosure, and I already mentioned the attempts at disclosure which were not fruitful, and the last one, and I have no evidence of this from anywhere, that there was ever an occasion of recantation or taking back what she said. That ap-

parently did not ever occur as far as I know.

[Prosecutor]: How does the absence of recantation fit into your evaluation of her as it pertains to that syndrome?

[Dr. Tranel]: That's not surprising in view of her age. Recantation is a common part of this syndrome among younger children at early ages, particularly, and I am talking about four to eight years on, recanting is common. Among older adults it's less common. It's not surprising we don't see recantation here at the level of eighteen or nineteen years old.

 \* \* \* \* \* \*

[Prosecutor]: Can you summarize for us, Dr. Tranel, your opinion as to whether or not the character and personality type of [the victim], based upon your testing of her and evaluation, is consistent with the behavior pattern of other adolescents who have been victims or manifested symptoms of child sexual psychopathology?

[Dr. Tranel]: Yes I can.

[Prosecutor]: What is your opinion?

[Dr. Tranel]: My opinion is that this is a classic pattern of a long history of child sexual abuse. The symptoms evident today are consistent with a pattern of sexual abuse. The behavior is consistent with a pattern of sexual abuse. The cognitive and the academic functioning is also consistent with a pattern of prolonged severe sexual abuse.

### Vouching for Victim's Credibility

■ Since defense counsel failed to timely object to this testimony, we view this error through our plain error spectacles. To establish plain error, there must be: (1) violation of a clear and unequivocal rule of law, (2) in a clear and obvious manner, (3) which adversely affects a substantial right. *Zabel,* 765 P.2d at 362.

■ Upon close scrutiny of the testimony, we feel that Dr. Tranel did not clearly violate our rule against vouching for credibility. We reach this conclusion realizing that often an expert's testimony will have the incidental effect of supporting the victim's credibility. *Montoya,* 822 P.2d at 365 (*citing Zabel,* 765 P.2d at 361, and *Griego v. State,* 761 P.2d 973 (Wyo.1988)). However, incidental bolstering of the victim's credibility alone does not make the expert testimony improper. *Id.*

■ Dr. Tranel's remarks do not rise to the level of clear error as we found in *Zabel* and more recently in *Whiteplume v. State,* 841 P.2d 1332 (Wyo.1992). In *Zabel,* the expert repeatedly used terms synonymous with credibility ("fabricating," "verification," "lying"). 765 P.2d at 359–60. In *Whiteplume,* during a police officer's testimony, he stated that he had determined the victim had been raped and then directly linked that conclusion to the victim's story. 841 P.2d at 1337. Nowhere in Dr. Tranel's testimony does he directly vouch for the victim's credibility nor use any synonymous terms like "fabricate." Nor does Dr. Tranel state that he concluded that the victim had been abused, instead he states that she fits the mold of behavior for sexual abuse.

Recently, we held that where a clinical psychologist, testifying as an expert, discusses general symptoms of rape victims, there is no violation of the rule against vouching for credibility. *Rivera v. State,* 840 P.2d 933, 939 (Wyo.1992). We think Dr. Tranel's testimony more closely parallels the testimony in *Rivera.* Dr. Tranel simply discussed the typical behavior tendencies of a child sexual abuse victim and then related them to the victim. Therefore, we hold that Dr. Tranel's testimony did not violate the rule against vouching for credibility.

### Admissibility of CSAAS Evidence

■ Appellant next contends that Dr. Tranel's testimony concerning the five characteristics of CSAAS was inadmissible. Appellant argues that CSAAS is not a recognized diagnosis within the field of psychology, and therefore was inappropriately offered to assist the trier of fact. This argument is couched in terms of United States Supreme Court precedent, *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923) and *Cullin v. State,* 565 P.2d 445 (Wyo.

1977), both of which addressed the admissibility of scientific evidence before we adopted the Federal Rules of Evidence. In *Rivera*, however, we concluded that the admissibility of scientific evidence should be analyzed in accordance with our Rules of Evidence, specifically W.R.E. 702. 840 P.2d at 941. Therefore, we apply the Wyoming Rules of Evidence.

Previously, we used three criteria in assessing the admissibility of scientific expert witness testimony. First, the subject matter of the expert testimony must be beyond the understanding of laypersons and be distinctly related to some science. Second, the expert must possess sufficient skill, experience, or knowledge within the science to raise the inference that the expert's testimony will assist the trier of fact. Third, the scientific basis of the expert testimony must be in such a state of development so as to permit the expert to make a reasonable opinion. *Buhrle v. State*, 627 P.2d 1374, 1377 (Wyo.1981) (*quoting Dyas v. United States*, 376 A.2d 827, 832 (D.C.App.1977), *cert. denied* 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977)); (*Buhrle*, applying the three-part test, held inadmissible evidence of the "battered woman syndrome" because the state of the science was not sufficiently demonstrated).

We have held expert testimony concerning behavioral characteristics of adolescent victims of sexual assault admissible because it may assist the jury in understanding the victim's inconsistent behavior. *Griego v. State*, 761 P.2d 973, 978–79 (Wyo. 1988). However, the expert in *Griego* based her testimony on her professional experience as a safe house coordinator and psychologist, not on CSAAS. Therefore, this court has not yet faced the admissibility of CSAAS evidence. We will here flesh out the basic purpose of CSAAS and examine how other jurisdictions have dealt with it.

The purpose of CSAAS is to define a "common language" for clinical psychologists dealing with child sexual abuse and to assist them in providing therapy and treatment. CSAAS is not intended as a means of detecting the existence of abuse. John

E.B. Myers, Jan Bays, Judith Becker, Lucy Berliner, David L. Corwin and Karen J. Saywitz, *Expert Testimony in Child Sexual Abuse Litigation*, 69 Neb.L.Rev. 1, 66–67 (1989) (*citing* Summit, *The Child Sexual Abuse Accommodation Syndrome*, 7 Child Abuse & Neglect 177 (1983)); *see also* Robert J. Levy, *Using "Scientific" Testimony to Prove Child Sexual Abuse*, 23 Fam.L.Q. 383, 393 (1989). The five recognized behavioral symptoms of CSAAS are: "(1) secrecy, (2) helplessness, (3) entrapment and accommodation, (4) delayed, conflicted, and unconvincing disclosure, and (5) retraction." Myers *et al.*, *supra* at 66–67. Because CSAAS is not diagnostic, the majority of courts dealing with CSAAS testimony have limited its admissibility. *Id.* at 68; *see also* McCormick on Evidence § 206, pp. 925–26 (4th ed. 1992). Some jurisdictions require a limiting instruction when CSAAS evidence is offered. *See People v. Housley*, 6 Cal.App.4th 947, 8 Cal.Rptr.2d 431, 438 (1992); *Davenport v. State*, 806 P.2d 655, 660 (Okl.1991). Other courts will not admit testimony concerning CSAAS if offered to prove abuse occurred. *See State v. J.Q.*, 252 N.J.Super. 11, 599 A.2d 172, 182–83 (1991); *People v. Logan*, 168 A.D.2d 918, 564 N.Y.S.2d 885 (1990). Several jurisdictions admit CSAAS testimony solely to rehabilitate the victim's credibility. *See People v. Beckley*, 434 Mich. 691, 456 N.W.2d 391, 398 (1990); *People v. Nelson*, 203 Ill.App.3d 1038, 149 Ill.Dec. 161, 166, 561 N.E.2d 439, 444 (1990); *State v. Dodson*, 452 N.W.2d 610, 614 (Iowa App. 1989). A few jurisdictions never admit CSAAS because it has not attained scientific acceptance. *See Lantrip v. Commonwealth*, 713 S.W.2d 816, 817 (Ky.1986).

Generally, limits placed on the admissibility of CSAAS are intended to address its shortcomings due to its limited purpose. Therefore, these courts have fashioned the admission of CSAAS so as to avoid its being relied upon by the prosecution or the jury as proof that the abuse actually occurred.

CSAAS testimony is restricted because it offers no help to the jury of proof that abuse occurred. There is general agreement on the notion that CSAAS is unrelia-

ble for determining whether abuse actually occurred. Andrew Cohen, *The Unreliability of Expert Testimony on the Typical Characteristics of Sexual Abuse Victims,* 74 Geo.L.J. 429, 442 (1985); Myers, *et al., supra* at 61; Levy, *supra* at 393; Marion D. Hall, *The Role of Psychologists as Experts in Cases Involving Allegations of Child Sexual Abuse,* 23 Fam.L.Q. 451, 463 (1989); *see also J.Q.* 599 A.2d at 184; *Lantrip,* 713 S.W.2d at 817. The evidence is unreliable because there is considerable controversy and dispute over the inclusive traits. The list of symptoms associated with child sexual abuse includes behaviors which might also be manifest in a child who was not sexually abused but has been subject to some other childhood stress. *Id.*

CSAAS evidence can be very prejudicial due to its unreliability. In *Beckley,* the Michigan court wrote:

> Indeed, the evidence has a very limited use and should be admitted cautiously because of the danger of permitting an inference that as a result of certain behavior sexual abuse in fact occurred, when evidence of the syndrome is not a conclusive finding of abuse.

*Beckley,* 456 N.W.2d at 405–06. Because of the potential severe prejudicial effect, W.R.E. 403 also plays a role in the decision on whether to admit CSAAS evidence. Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

When CSAAS evidence is freely admitted without limitation, the danger of misleading the jury becomes significant.

Other jurisdictions, like ours, have admitted expert testimony concerning common behaviors of sexually abused children without limitation. They have done so because the evidence provided insight into the sexually abused child's often strange demeanor. *Griego,* 761 P.2d at 979; *United States v. Hadley,* 918 F.2d 848, 853 (9th Cir.1990); *State v. Edward Charles L.,* 183 W.Va.

641, 398 S.E.2d 123, 141 (1990); *United States v. St. Pierre,* 812 F.2d 417, 420 (8th Cir.1987); *State v. Timperio,* 38 Ohio App.3d 156, 528 N.E.2d 594, 597 (1987); *State v. Geyman,* 224 Mont. 194, 729 P.2d 475, 479 (1986); *State v. Myers,* 359 N.W.2d 604, 610 (Minn.1984); *State v. Middleton,* 294 Or. 427, 657 P.2d 1215, 1216 (1983). In each of these cases, however, the testifying experts based their remarks concerning common behaviors of sexually abused children on their own personal professional experience, apparently without mention of CSAAS. *Griego,* 761 P.2d at 978; *Hadley,* 918 F.2d at 853; *Edward Charles L.,* 398 S.E.2d at 139; *St. Pierre,* 812 F.2d at 419; *Timperio,* 528 N.E.2d at 596; *Geyman,* 729 P.2d at 479; *Myers,* 359 N.W.2d at 608–09; *Middleton,* 657 P.2d at 1216.

Recently, in commenting on the relevance and admissibility of expert testimony concerning behavior of sexual assault victims, we said:

> Expert testimony that discusses the behavior and characteristics of sexual assault victims and the range of responses to sexual assault encountered by experts is admissible. *Scadden v. State,* 732 P.2d 1036 (Wyo.1987). Such testimony is relevant and helpful in explaining to the jury the typical behavior patterns of adolescent victims of sexual assault. *Griego v. State,* 761 P.2d 973 (Wyo.1988). It assists the jury in understanding some of the aspects of the behavior of victims * * *. *Zabel v. State,* 765 P.2d 357 (Wyo.1988).

*Rivera,* 840 P.2d at 939. As is evident from this passage, we recognized that sexual abuse behavior evidence is relevant as an explanation for a victim's reactions to sexual abuse.

In both *Scadden* and *Griego* we quote *People v. Bledsoe,* 36 Cal.3d 236, 203 Cal. Rptr. 450, 681 P.2d 291, 298 (1984) which said:

> [E]xpert testimony on rape trauma syndrome may play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evi-

dence free of the constraints of popular myths.

Although *Bledsoe* dealt with the admissibility of "rape trauma syndrome" evidence, it was invoked as the guiding precedent for dealing with CSAAS testimony by both the California court in *People v. Bowker*, 203 Cal.App.3d 385, 249 Cal.Rptr. 886 (1988), and the Michigan Court in *People v. Beckley*, 456 N.W.2d 391. Since we previously sought guidance on the similar issue of admissibility of "rape trauma syndrome" evidence from California jurisprudence, we also consider the California position on the admissibility of CSAAS testimony.

In *Bowker*, a child psychologist testified at great length concerning CSAAS and explained in detail each of the five specific behavior traits associated with CSAAS. 249 Cal.Rptr. at 888. The California Court of Appeals held that CSAAS evidence is admissible only to demonstrate that the victim's behavior is not inconsistent with being sexually abused and therefore the jury must be instructed that CSAAS is not intended to prove that the victim's claim of abuse is true. *Id.* at 892. However, the court affirmed the sexual abuse conviction because there was sufficient other testimonial and physical evidence which supported the conviction. *Id.* at 892–93.

Most recently, a New Jersey court grappled with CSAAS admissibility and held that "CSAAS evidence is generally reliable to explain secrecy, belated disclosure and recantation by a child sex abuse victim; * * * CSAAS is not reliable to prove that sex abuse, in fact, occurred[.]" *J.Q.*, 599 A.2d at 189. In so holding, that court reversed a father's conviction for sexual assault against his daughters because the prosecution improperly bolstered the victims' credibility and because the prosecution expert's opinion that the children had been abused was based solely·on CSAAS and similar syndrome evidence. *Id.* As far as the expert testimony is concerned, that case is very similar to ours because the expert in *J.Q.* explained all five symptoms of CSAAS despite the fact that neither victim ever recanted. *Id.* at 177.

Today, we adopt, generally, the view taken by California in *Bowker*, by Michigan in *Beckley*, and by New Jersey in *J.Q.* We do so because we find that CSAAS evidence has yet to reach the stage of development which would permit an expert to reasonably conclude, on the basis of CSAAS alone, that abuse occurred. Therefore, CSAAS does not assist the trier of fact on the issue of whether abuse actually occurred. Additionally, we believe that admission of CSAAS evidence, without limitation, would run too high a risk of misleading the jury and therefore be more prejudicial than probative under W.R.E. 403. However, we also find that CSAAS evidence is relevant and admissible to dispel myths the public might hold concerning a child sexual abuse victim's post-abuse behavior if that behavior is an issue in the case.

 Qualified experts on child sexual abuse may, therefore, use evidence of CSAAS characteristics of sexually abused children for the sole purpose of explaining a victim's specific behavior which might be incorrectly construed as inconsistent with an abuse victim or to rebut an attack on the victim's credibility. For example, if the facts of a particular case show that the victim delayed reporting the abuse, recanted the allegations, kept the abuse secretive, or was accommodating to the abuse, then testimony about that particular characteristic of CSAAS would be admissible to dispel any myths the jury may hold concerning that behavior. Additionally, if requested, a limiting instruction concerning the narrow purpose of CSAAS should be granted. However, expert testimony of CSAAS cannot be used for the purpose of proving whether the victim's claim of abuse is true.

Having determined the general parameters for admitting CSAAS testimony, we must now discern whether Dr. Tranel's testimony, concerning CSAAS, was proper. Again, we apply plain error in reviewing this issue.

 Throughout Dr. Tranel's testimony, he never directly states that, because D–2 represents a classic case of CSAAS, she was abused. Instead he explains in

detail each specific CSAAS characteristic and how it applies in D–2's case. The majority of this testimony appeared to explain D–2's behavior, which included delayed reporting, accommodation, secrecy and helplessness. Therefore, it was appropriate for the State to explain some of these inconsistencies through Dr. Tranel's CSAAS testimony.

Dr. Tranel, however, also described the fifth trait of CSAAS, recantation, which he explained was inapplicable to D–2. Since D–2 never recanted, the explanation of that particular type of behavior was unnecessary, and Dr. Tranel's CSAAS testimony exceeded its admissible purpose. We cannot say, however, that Dr. Tranel's impermissible comments regarding recantation adversely affected the appellant's substantial rights.

Although Dr. Tranel's testimony references CSAAS often, CSAAS is not the sole basis for his ultimate conclusion that D–2's case represents "a classic pattern of a long history of child sexual abuse." Dr. Tranel performed a battery of psychological and intelligence tests when he examined D–2. In fact, as evidenced by the prosecutor's questions, Dr. Tranel's ultimate conclusion appears to be grounded in the totality of his examination not solely on his CSAAS analysis. Therefore, unlike the expert testimony in *J.Q.*, sufficient admissible bases exist to support Dr. Tranel's testimony.

In addition, we do not feel that it is reasonably likely that the jury would have returned a different verdict had they not heard the improper CSAAS testimony. On cross-examination, appellant attacked the credibility of CSAAS by eliciting the current status—non-recognition—of CSAAS in the psychology profession. We must assume that this evidence put the jury on notice of the weight afforded Dr. Tranel's comments regarding CSAAS.

In reaching our decision today, we acknowledge the inherent difficulties of proving sexual abuse. Usually, only two eye witnesses exist, the victim and the accused, thus putting a premium on credibility. It is, therefore, often necessary for the prosecution to enlist the services of an expert to explain the victim's unusual behavior in delayed reporting, accommodation and like aberrations. However, we cannot abrogate time-tested and fundamental tenets of evidence because child sexual abuse is an increasingly prevalent problem. Rule 702, W.R.E. requires that expert evidence assist the trier of fact in order to be relevant and admissible. The determination of whether the evidence assists the trier of fact is premised on the reliability of that evidence. CSAAS evidence has not yet reached the stage of development to make it, alone, a reliable indicator of the existence of sexual abuse.

### Witnesses' Recitation of Accuser's Allegations

Appellant's next claim of error alleges that three of the State's witnesses were permitted to testify, improperly, about the victim's allegations. Appellant argues that Dr. Tranel, the sheriff, and the sheriff's wife each gave inadmissible hearsay testimony when they discussed the specifics of the victim's allegations against appellant.

Appellant argues that the testimony of the sheriff and the sheriff's wife concerning the victim's accusations against the appellant were inadmissible hearsay. The State asserts that this testimony was admissible as prior consistent statements under W.R.E. 801(d)(1)(B). Rule 801(d)(1)(B) provides:

(d) *Statements which are not hearsay.*—A statement is not hearsay if: (1) Prior Statement by Witness—The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive[.]

For a statement to be admissible as a prior consistent statement, we require the existence of two conditions: (1) that the prior statement is consistent with the declarant's testimony, and (2) that there is an express or implied charge, against the declarant, of recent fabrication or improper influence or motive. *Montoya,*

822 P.2d at 367 (*citing Makinen v. State*, 737 P.2d 345, 349 (Wyo.1987)). In other words, a witness may testify concerning what another witness (declarant) said, so long as the declarant's testimony is consistent with what the witness claims the declarant said and the declarant's testimony is being challenged as false or improperly influenced.

 A prior consistent statement may be used as substantive evidence if the alleged improper influence arose after the statement was made. *Montoya*, 822 P.2d at 367 (*citing Stephens v. State*, 774 P.2d 60, 71 (Wyo.1989)). However, if the prior consistent statement was made after the improper influence arose, then the statement may only be used for rehabilitative purposes. *Id.* When a prior consistent statement is admissible only for rehabilitative purposes, a limiting instruction must be given, but only if requested. *Id.*

 Again, because the appellant failed to raise a timely objection to the testimony of the sheriff and the sheriff's wife concerning the victim's prior consistent statements, the alleged error must be plain error. Admitting the testimony by the sheriff and his wife concerning the victim's prior consistent statements was not an unequivocal violation of a clear rule of law which resulted in substantial prejudice to the appellant. The testimony of both the sheriff and the sheriff's wife concerning the victim's prior statements was consistent with the victim's testimony, and the appellant had implicitly raised the charge of improper influence in his opening statement.

 Appellant correctly asserts that the prior consistent statements arose after the alleged improper influence. Both the sheriff and his wife testified to statements made by the victim following her arrest for check writing fraud. Therefore, the prior consistent statements testimony should have been limited to rehabilitative purposes. However, since no limiting instruction was requested by appellant, the court did not err in failing to give the instruction.

Next, appellant asserts that Dr. Tranel's testimony concerning the victim's statements to him about the alleged abuse was inadmissible hearsay. Appellant incorrectly claims that he made a proper objection to Dr. Tranel's testimony. The objection appellant points to was raised after Dr. Tranel's direct testimony had been completed, and it fails to mention hearsay. Therefore, plain error is again applicable.

Appellant fails to cite specifically to any part of Dr. Tranel's testimony which amounts to inadmissible hearsay. In his brief he simply writes, "Dr. Tranel's testimony, reciting [the victim's] version of events in general outline cannot be justified as an exception to the hearsay rule * * *." This makes it difficult for us to assess whether there was a hearsay violation. From the record, we cannot say that admission of Dr. Tranel's testimony was clearly violative of a rule of law so as to present substantial prejudice to the appellant.

### *Prior "Bad Acts" Evidence*

 Appellant's final claim of error alleges that several of the State's witnesses were permitted to testify to prior "bad acts" by the appellant, in contravention of W.R.E. 404(b). This claim is asserted against the testimonies of Dr. Tranel, the sheriff, the sheriff's wife, and T–1's husband.

Rule 404(b), W.R.E., provides:

*Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Whether evidence of other "bad acts" by the accused meets the requirements of W.R.E. 404(b) is determined by looking to five factors. The five factors are as follows:

(1) Proof of the other similar crimes [acts] must be plain, clear and convincing.

(2) The other crimes [similar acts] must not be too remote in time from the charged offense.

(3) The evidence of the other crimes [similar acts] must be introduced for a purpose sanctioned by Rule 404(b) of the [Wyoming] Rules of Evidence.

(4) The element of the charged offense that the evidence of other crimes [similar acts] is introduced to prove must be a material issue in the case.

(5) There must be a substantial need for the probative value of the evidence of the other crimes [similar acts].

*Rivera*, 840 P.2d at 940.

Over time, we have further clarified our approach to Rule 404(b) evidence. The five-part test is not a rule of evidence itself but instead is simply an analytical tool. *Story v. State*, 721 P.2d 1020 (Wyo.1986), *cert. denied* 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 405 (1986). Each of the five factors need not be satisfied before a trial judge may admit Rule 404(b) evidence. *Rivera*, 840 P.2d at 940 (*citing Story*, 721 P.2d at 1032). There is no specific time limitation in determining remoteness of the similar act. *Britton v. State*, 845 P.2d 1374, 1376 (Wyo.1992). The specific exceptions listed in W.R.E. 404(b) are not exhaustive but are only illustrative. *Gezzi v. State*, 780 P.2d 972, 974 (Wyo.1989) (holding that testimony by a third party about prior sexual misconduct by the accused was admissible to corroborate the victim's testimony because victim's credibility was directly at issue).

The challenged testimony of the sheriff and his wife went as follows:

[Prosecutor]: And generally can you tell us what she told you?

[Sheriff]: She wanted to get some help. She wanted someone to be aware of what her father had been doing to her for several years.

[Prosecutor]: Generally can you explain what it was that she said her father had been doing?

[Sheriff]: That he had been molesting her for many years and named several things that he had done.

\* \* \* \* \* \*

[Prosecutor]: What else did you visit with her about?

[Sheriff's Wife]: Then she started talking about her father had sexually molested her since she was a child. At this point [victim] started sobbing.

As to Dr. Tranel's testimony, appellant claims that Dr. Tranel's "outline of the accuser's story" violated W.R.E. 404(b).

The thrust of appellant's argument concerning these three witnesses is that they testified to other "similar acts" of the accused without personal knowledge of the acts. Support for the assertion, that personal knowledge is required, is premised on our previous case law concerning the admissibility of other similar acts by the accused. However, appellant cites no authority which requires personal knowledge before a third party witness may testify to "similar acts" by the accused, nor does appellant cite to W.R.E. 602 (lack of personal knowledge). Rule 5.01, W.R.A.P., requires reasons and citations of authority in support of a party's contentions. *Gulf Oil Corp. v. Wyo. Oil and Gas Conservation Comm'n*, 693 P.2d 227, 238–39 (Wyo.1985). Since appellant has failed to present a cogent argument on the issue of personal knowledge as a requisite to Rule 404(b) evidence, we will not review the issue.

■ As to appellant's more generic argument—that the testimony of the sheriff, the sheriff's wife, and Dr. Tranel was inadmissible under our W.R.E. 404(b) approach—we find that the appellant was not substantially prejudiced. Both the sheriff's and his wife's contended testimony was very general in describing the alleged similar act by the accused. Without the advantage of an objection and discussion of the propriety of the testimony, we cannot discern the purpose for which the testimony was introduced.

Again, appellant omits any clear reference to statements by Dr. Tranel which allegedly violate W.R.E. 404(b). It does not appear, from our own careful review of the record, that Dr. Tranel testified to any particular similar acts of the appellant. Although the entirety of Dr. Tranel's testimo-

ny infers that there were previous instances of similar abuse by appellant, we cannot locate any statement which amounts to a violation of W.R.E. 404(b).

██ Appellant also asserts that the testimony of T–1's husband, concerning an earlier incident involving the appellant grabbing D–2's crotch and then lewdly commenting, was inadmissible under W.R.E. 404(b). T–1's husband testified that the incident occurred only two or three years prior to the alleged abuse of these charges. We feel that this act of grabbing the victim's crotch is sufficiently similar in nature and close enough in time under our approach to W.R.E. 404(b) to hold that the rule was not clearly violated.

### Victim's Compensation Surcharge

██ Appellee has brought to our attention an error by the district court in applying W.S. 1–40–119. The court extended the time for payment of a $700.00 victim's compensation fund surcharge which was imposed on appellant. Appellee is correct in stating that W.S. 1–40–119 is mandatory in requiring payment of the surcharge within ten days of imposition. We have recognized that the statute gives the district court no discretion to extend the time for payment, *Seaton v. State*, 811 P.2d 276, 282 (Wyo.1991), and any part of the sentence which extends the time for payment of the surcharge beyond the ten-day limit is unlawful and must be vacated. *Hamburg v. State*, 820 P.2d 523, 531 (Wyo.1991).

Therefore, we vacate that portion of appellant's sentence imposing a surcharge for the victim's compensation fund.

Judgment affirmed in part and reversed in part.

URBIGKIT, Justice, dissenting.

In initial consideration, I would reject Dr. Ned Tranel as a qualified expert witness in Wyoming court proceedings carte blanche. Dr. Tranel may be considered a member of a platoon, if not an army, of the new mode of forensic witnesses. These experts are generically characterized as witnesses with testimony for hire. With that direction, these experts provide escape from effective cross-examination because the theories which they profess, for a fee, are often not "generally accepted" as valid determinates.

Even if I could accept Dr. Tranel's non-medically recognized expertise, which I do not, the vouching and verification of the complainant's testimony by reference to the Child Sexual Abuse Accommodation Syndrome should not be permitted. *Lessard v. State*, 719 P.2d 227 (Wyo.1986); *Smith v. State*, 564 P.2d 1194 (Wyo.1977). This case disregards the forbidden terrain for testimony pontificated by some "experts" which was carefully excised from trial usage by direction of this court in *Zabel v. State*, 765 P.2d 357 (Wyo.1988). *Zabel's* direction to protect the truth in decision making by the jury must be followed. Otherwise, we turn trials into forensic witness combat where, in a criminal context, the defendant never has an equal or fair fight while seeking justice. *Gale v. State*, 792 P.2d 570, 590 (Wyo.1990), Urbigkit, J., dissenting.

This case provides another example of the results of an "expert witness/bad acts" prosecutorial campaign where evidence of guilt is unequally contested. The search for truth is submerged under the visible surface and obscured by the free flowing, but expensive, hypothesis delivered by the prosecution's expert. The resulting evidentiary test focuses primarily on the expert's communication skills and vague recitation of behavioral characteristics which are then combined with the derogatory connotations, provided for adverse jury influence, from non-relevant bad acts testimony. In this case, we add the redundancy of the sole witness' exculpatory testimony to both validate whatever the complainant said and to provide independent stimuli for jury decisional motivation. The decision here clearly bypasses the reliability requirement of the *Frye* test for expert testimony introduction. *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013 (C.A.D.C.1923). I would agree with the analysis provided by appellant:

The *Frye* test has survived the adoption of the Federal Rules of Evidence, *United States v. Brown*, 577 [557] F.2d

541 (6th Cir.1977); *United States v. Green*, 548 F.2d 1261 (6th Cir.1977), and presumably is still part of Wyoming law when a person professing expertise purports to interpret test results and other scientific data. There are, after all, at least two parts to the introduction of scientific evidence. First there is the test data itself, and [s]econd, there is the expert's interpretation or opinion regarding that data. This is as true with psychological testing as it is with the polygraph. The test data is meaningless and irrelevant without the interpretive expert opinion. But with an expert opinion that does not conform to the *Frye* standard the entire matter is inadmissible.

And, in conclusion, appellant states:

The testimony of Dr. Tranel which vouched for the credibility of the accuser, as well as the repetition of the accuser's story by others, and the lack of acceptance of Dr. Tranel's theories, and the repetition of prior dissimilar misconduct by Appellant would each, taken individually, be sufficient grounds for reversal of Appellant's conviction and remand for a new trial. Considered in combination, these significant and serious evidentiary deficiencies are part of a considered program to bolster the credibility of the accuser and destroy the character of the Appellant, prior to evidence of crimes charged in this case being presented. That is an inappropriate method of proving the offenses charged, a method which denies Appellant the benefit of due process of law and the presumption of innocence.

I respectfully dissent.